**In re Jerrie S. COLISH, Debtor.**

**Jerrie S. Colish, Plaintiff,**

**v.**

**United States of America, Department of Treasury Internal Revenue Service, Defendant.**

**United States of America, Third–Party Plaintiff,**

**v.**

**Jerrie S. Colish, Third–Party Defendant.**

**Bankruptcy No. 197–14664–608.**
**Adversary Nos. 197–1399–608, 00–01633–608.**

United States Bankruptcy Court,
E.D. New York.

Oct. 23, 2002.

Wendy J. Kisch, Batholomew Cirenza, Department of Justice, Tax Division, Washington, D.C., for United States.

Gary C. Fischoff, Fischoff and Associates, Garden City, NY, for Debtor, Plaintiff and Third–Party Defendant.

## DECISION AND ORDER

CARLA E. CRAIG, Bankruptcy Judge.

This matter comes before the Court on the complaint of Jerrie S. Colish ("Colish" or "Debtor") to have his debt to the Internal Revenue Service ("Government") for his assessed federal income tax liabilities for years 1987 through 1992 declared dischargeable under 11 U.S.C. § 523(a)(1) and, additionally, on the complaint of Government seeking a determination that Debtor's Chapter 7 discharge should be revoked pursuant to 11 U.S.C. § 727(d)(2).

### Procedural History

On April 29, 1997, Debtor filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code (11 U.S.C.) and was granted a discharge of all dischargeable debts on August 19, 1997.

On August 8, 1997, Colish filed a complaint (Govt.Ex. R1.) to commence an adversary proceeding, wherein he requested that the Court issue an order declaring his assessed federal income tax liabilities for years 1986 through 1993 dischargeable under 11 U.S.C. § 523(a)(1). On September 30, 1999, the Honorable Laura Taylor Swain, to whom this case was then assigned, determined that Debtor's 1993 assessed federal income tax liabilities were non-dischargeable priority liabilities pursuant to 11 U.S.C. § 507(a)(8)(A)(ii). *In the Matter of Jerrie S. Colish,* 239 B.R. 670 (Bankr.E.D.N.Y.1999). Hence, the only years for which dischargeability is still in dispute are tax years 1987 through 1992.

Subsequently, on October 26, 2000, the Government commenced an adversary proceeding seeking the revocation of Debtor's Chapter 7 discharge pursuant to 11 U.S.C. § 727(d)(2) on the grounds that Debtor failed to disclose on Schedule B of the bankruptcy petition his remainder interest in a trust established by his father and that Debtor, additionally, failed to disclose and surrender to the Chapter 7 Trustee cash and other property distributions he received from the trust upon the maturing of his remainder interest. (Govt.Ex. S1.) On January 17, 2001, the Court denied the Government's motion to consolidate both adversary proceedings, but ordered that the two adversary proceedings be tried jointly. Consequently, on September 4 and 5 of 2001 and November 20, 2001, the above-entitled adversary proceedings were tried simultaneously. At the conclusion of the trial, the Court directed the parties to file post-trial briefs.

This Court has considered thoroughly all submissions, evidence, and arguments relating to this matter, and the decision rendered herein reflects such consideration.

## Jurisdiction

This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 151, 157 and 1334, and both these adversary proceedings are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I) and (b)(2)(J).

## Facts

### Debtor's Work Experience and Education

Debtor is an attorney who holds a Juris Doctor (J.D.) degree from the University of Miami Law School and Masters of Law (LL.M.) degree in taxation from the University of Miami Law School. (T1 63.)[1] In addition to his legal education, Debtor has a "Series 7" license to sell variable securities and a license to sell life insurance products. (JPTO[2] ¶ 5 (4).)

Debtor has substantial work experience in both private legal practice and in the sale of securities. From 1979 through October of 1985, Debtor practiced law, advising clients on federal tax issues and corporate and partnership formations. (JPTO ¶ 7.) Later, from 1985 to 1987, Debtor was hired by Equityline Securities as its vice president and general counsel, and worked in sales, marketing, analysis, due diligence and wholesaling. (JPTO ¶ 9.)

After an extensive period of time working as an independent wholesaler of securities, from October of 1987 through November 1994 (JPTO ¶ 10.), Debtor was employed by a Wall Street securities firm, D.H. Blair, as a retail sales broker, from late 1994 to late 1996. (JPTO ¶ 10.) Subsequently, starting in late 1996 and through the time of trial, Debtor has worked with a venture capital firm, Spencer Trask. (T1 at 67.)

At the time of trial, Debtor resided in a rented 4–bedroom apartment in Brooklyn, New York and had resided there since June 1993. (JPTO ¶ 32) From 1988 to 1993, Debtor resided in a rented apartment in Pennsylvania. Debtor leased a 1986 Buick Skylark from 1986 to 1991. (JPTO ¶ 31.)

### Debtor's Expenses and Lifestyle

From 1986 to 1998, other than normal living expenses, Debtor's expenses mainly consisted of: 1) child support payments pursuant to a marriage settlement agreement, 2) tuition payments for private school education for his four children, and 3) charitable contributions and gifts made to his ex-wife and friends.

Pursuant to a marriage settlement agreement ("Agreement"), dated March 28, 1988, Debtor and his wife became legally separated. Debtor has four children. Under the terms of the Agreement, Debtor agreed to pay $375 per month, per child as support. (Debtor's Ex. 2 ¶ 7.) The Agreement further provides increases in the amount of support annually in the amount of "one-half of the excess of his net income from all sources over Sixty–Thousand ($60,000) Dollars" and that child support in no instance shall exceed $600 per month per child. (Debtor's Ex. 2 ¶ 7.) However, the $600 maximum allowance per month per child apparently could be modified "provided that the needs of the children . . . require more." Furthermore, pursuant to ¶ 8 of the Agreement, Debtor was to pay for his children's college expenses provided that he was financially able to do so.[3] Nothing in the Agreement

---

**1.** References to T1 refer to the September 4, 2001 transcript. References to T2 refer to the September 5, 2001 transcript. References to T3 and T4 refer to the morning and afternoon transcripts from November 30, 2001.

**2.** References to "JPTO" are to the Joint Pre–Trial Order approved by the Court on September 4, 2001.

**3.** Debtor and his former wife agreed:

required the Debtor to fund the cost of private elementary or secondary school education.

Nevertheless, beginning in 1986 and continuing on through 1999, Debtor paid for his children's private school education. (T1 at 113, 124.) Although all four children graduated from Abrams Hebrew Academy in Yardley, Pennsylvania, one daughter attended boarding school (T2 at 45, 76) and one son went to public high school for two years. (T1 at 124.) The tuition at the private schools amounted to $16,000 in 1986, and steadily rose throughout the period at issue, reaching $33,000 in 1992. The tuition remained relatively constant from 1992 to 1997 at $33,000, before increasing substantially in 1998 to $48,500 due to one of Debtor's children attending college.[4]

Furthermore, commencing in 1989 and continuing through 1998, Debtor made charitable contributions. (T2 at 20–21.) The contributions varied significantly from year to year, ranging from a low of $1,774 in 1997 to a high of $15,962 in 1993. (Govt. Ex. D3 through D12.)

In addition, Debtor gave substantial sums of money to close friends and his ex-wife. In 1998, Debtor gave his ex-wife $12,500. (Govt. Ex. PP; T2 93.) It was initially given as a loan, but later the Debtor forgave the loan, and it became a gift. (T2 at 93.) Debtor also felt responsible for the losses incurred by three friends who had invested and lost money on Debtor's advice. (T1 at 182–183.) As a result, Debtor gave three $20,000 nonrecourse loans each to the three friends.[5] Repayment was solely conditioned on the successful investment of the loans. (T1 at 182–183.)

*Tax Return Filings: 1987–1998*

On October 12, 1988, Debtor filed late his federal income tax return for the 1987 tax year in which he made a payment of $2,302 through employer withholding. (Govt.Ex. A1–A2.) His return reflected that he owed tax in the amount of $11,675, inclusive of interest and penalties, thus leaving a deficiency of $9,373. *Id.*

On April 15, 1989, Debtor timely filed his federal income tax return for the 1988 tax year in which he failed to make any payment. His return reflected that he owed tax in the amount of $6,579, inclusive of interest and penalties, thus leaving a deficiency in such amount. *Id.*

On March 18, 1991, Debtor filed late his federal income tax return for the 1989 tax year in which he made estimated payments of $3,250. His return reflected that he owed tax in the amount of $27,315, inclusive of penalties and interest, leaving a deficiency of $24,065. *Id.*

On June 3, 1991, Debtor timely filed his federal income tax return for the preceding year in which he made estimated payment of $100. His return reflected that he owed tax in the amount of $25,050, inclusive of interest and penalties, leaving a deficiency of $24,950. *Id.*

---

to contribute to the reasonable cost of undergraduate college education...debtor's obligation is conditioned on: 1) his being consulted with respect to the choice of educational institutions..., and 2) upon the children making application for any financial aid [Debtor] deems appropriate, and 3) upon [debtor's] financial ability to pay. Paragraph 8, Marriage Settlement Agreement, Debtor's Exhibit 2, at 6.

**4.** In 1998, Debtor's oldest daughter began attending Philadelphia College of Science and Textiles, a private school in Philadelphia, Pennsylvania. See Trial Transcript (9/5/01) at 42.

**5.** One $20,000 check was returned.

On April 10, 1992, Debtor timely filed his federal income tax return for the preceding year in which he did not make any payments. His return reflected that he owed tax in the amount of $16,207, inclusive of interest and penalties, leaving a deficiency in such amount. *Id.*

On April 15, 1993, Debtor timely filed his federal income tax return for the preceding year in which he made an estimated payment of $11,310. His return reflected that he owed tax in the amount of $27,042, leaving a deficiency of $15,732. *Id.*

On April 15, 1994, Debtor timely filed his federal income tax return for the preceding year in which he failed to make any payment. His return reflected that he owed tax in the amount of $38,913. *Id.*

On April 15, 1995, Debtor timely filed his federal income tax return for the preceding year in which he made an estimated payment of $9,250. His return reflected that he owed tax in the amount of $25,462, inclusive of interest and penalties, leaving a deficiency of $16,212. *Id.*

On April 15, 1996, Debtor timely filed his federal income tax return for the preceding year, and made a payment of $28,936 through employer withholding. His return reflected that he owed tax in the amount of $26,611, inclusive of interest and penalties, leaving an overpayment of $2,770, which was credited to his 1986 tax liability. *Id.*

On April 27, 1997, Debtor timely filed his federal income tax return for the preceding year, and made a payment of $27,009 through employer withholding. His return reflected tax in the amount of $12,516, inclusive of interest and penalties, leaving an overpayment of $14,493, which was credited to his 1986 tax liability. *Id.*

On June 25, 1998, Debtor filed late his federal income tax return for the preceding year, and made a payment of $20,826, through employer withholding. His return reflected tax in the amount of $12,324, inclusive of interest and penalties, leaving an overpayment of $8,502. *Id.*

On October 19, 1999, Debtor filed late his federal income tax return for the preceding year reporting no tax liability. On February 1, 2000, Debtor filed an Amended Return and made a $8,671 estimated payment as well as a $573 payment through employer withholding. His return reflected that he owed tax in the amount of $88,028, leaving a deficiency of $84,744. *Id.*

*Serial Offers in Compromise*

On April 30, 1992, Debtor submitted his first offer-in-compromise to the Government wherein he sought to compromise his tax liabilities for years 1986 through 1991, totaling $78,319, plus interest and penalties based on "doubt as to collectability" by offering to make future estimated tax payments and by paying $12,500. (Govt.Ex. F1.) The offer was amended on June 10, 1992 and again on April 5, 1993. (Govt.Ex. F2.) Under the revised offer, Debtor offered to pay $12,916 to compromise total reported tax liabilities of $85,241 for tax years 1987 through 1992. (Govt.Ex. F2.) On December 2, 1993, the Government rejected Debtor's first offer, as amended, based on Debtor's statement to the Government that the funds were no longer available. (Govt.Ex. F4.)

On April 20, 1994, Debtor submitted his second offer-in-compromise, seeking to pay only $12,500 for his total reported unpaid liabilities of $123,464 for tax years 1987 through 1993. (Govt.Ex. C.) The Debtor was, in effect, submitting the same amount as previously offered but attempting to satisfy an additional tax year as well. The Government determined that the Debtor actually had over $119,447 in net equity from which to collect outstanding tax liabilities of $130,780. (See attachment to

Govt. Ex. G3.) As a result, the Government formally rejected that offer on August 19, 1994, after determining that a much larger amount was collectible by the it. (Govt.Ex. G2.)

On September 15, 1994, Debtor submitted his third offer-in-compromise, which was amended on May 18, 1995. (Govt.Ex. H1.) As amended, Debtor offered to pay $20,000 to compromise total reported liabilities of $147,64. (Govt.Ex. H2.) The Government rejected Debtor's offer by letter dated June 22, 1995, and afforded him the opportunity to protest the decision. Debtor's final offer was rejected by letter on May 14, 1997 because a larger amount was deemed collectible. (Govt.Ex. H6.)

*The Mannie S. Colish Trust*

Mannie S. Colish, Debtor's father, established the Mannie S. Colish Trust ("Trust") on October 25, 1979. (Govt.Ex. W, X1, X2, Y.) The Trust provided a life estate interest to Lorraine S. Colish, Debtor's mother, and equal vested remainder interests to Debtor and his sister, Julie Colish. Mannie Colish died on January 11, 1981. (T1 at 140.) Upon his father's death, Debtor learned that he was a beneficiary of the Trust. (Govt.Ex. W, X1, X2, Y.) The Trust provided that Lorraine Colish had a testamentary power of appointment, which permitted her, by her last Will and Testament, to divest either remainder interest in the Trust. (Govt.Ex. W, X1, X2, Y.)

At the time of filing the bankruptcy petition, Debtor failed to disclose his remainder interest in the Trust in schedules filed with this Court. (Govt. Ex. P, Sch. "B", lines 18, 19; T1 at 145.) The Government contends that it only became aware of Debtor's interest in the Trust during settlement negotiations with the Debtor for adversary proceeding no. 97–1399, after which it commenced an adversary proceeding to revoke Debtor's discharge pursuant to 11 U.S.C. § 727(d)(2). (T4 at 18–19.)

On December 20, 1997, Lorraine Colish died and the Debtor became entitled to collect his remainder interest. (T1 at 140–141; Ex. AA.) Subsequently, from January 1998 through June 1998, Debtor received cash and other property distributions from the Trust, totaling $718,000. (T1 at 142.) As part of the distributions, Debtor received $479,631 from a land contract held by the Trust. (T1 at 165–1661; Govt. Ex. OO.) On January 13, 1998, Debtor wire-transferred his share of these proceeds from his Citizens Bank account in Flint, Michigan to an account he maintained with Chase Bank in New York. (T1 at 169.) Next, Debtor transferred $450,000 from the Chase account to a savings account opened at Citibank. (*Id.*) On January 27, 1998 Debtor transferred $200,000 from the Citibank savings account into Citibank checking account and $245,335 into a 7–day CD. (T1 at 170.) Debtor then transferred $100,000 of the $200,000 in the Citibank checking account to a personal account at Spencer Trask (held by Schroeder Bank). (T1 at 184.)

On March 23, 1998, Debtor created a Nevada Limited Partnership, Phoenix Samson Associates, L.P. in which Debtor was named a general partner and limited partner, holding a 96% interest of the partnership and the Jerrie Saul Colish Irrevocable Children's Trust ("Irrevocable Trust"), a limited partner, holding the other 4% interest. (Govt. Ex. J; T1 at 180.) Debtor funded the partnership with cash and property valued at $740,625, including his Spencer Trask account, his newly opened Citibank accounts, numerous stock warrants, various general and limited partnership interests acquired from the Trust

and extensive personal property.[6] Of the contributed funds, Debtor treated $711,000 (96% interest in partnership) as coming from himself and the other $29,625 coming from the Irrevocable Trust. However, the entire amount clearly came from Debtor's interest in the Trust. (T1 at 160–161.)

*Discussion*

*Pursuant to 11 U.S.C. § 523(a)(1)(C), Debtor's 1987 through 1992 Assessed Federal Income Tax Liabilities Are Non–Dischargeable*

A discharge in bankruptcy does not discharge debtor of all debts.

§ 523(a)(1)(C) provides in relevant part:

*Section 523. Exceptions to Discharge*

(a) A discharge under §§ 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual Debtor from any debt—

(1) for a tax or customs duty—

(C) with respect to which Debtor made a fraudulent return or willfully attempted *in any manner* [italics to highlight] to evade or defeat such tax.

■ The two exceptions to dischargeability in § 523(a)(1)(C) are to be read in the disjunctive. "Nondischargeability under § 523(a)(1)(C) is not limited to finding a fraudulent return." *In re Fernandez*, 112 B.R. 888, 891 (Bankr.N.D.Ohio 1990); *In re Tudisco*, 183 F.3d 133 (2d Cir.1999). Therefore, in order to prevail, the Government must prove that the Debtor *either* made a fraudulent return *or* the Debtor willfully attempted to evade or defeat payment of taxes. *In re Lilley*, 152 B.R. 715, 720 (Bankr.E.D.Pa.1993); *In re Griffith*, 161 B.R. 727 (Bankr.S.D.Fla.1993).

■ At issue in Adversary Proceeding No. 197–1399 is whether Debtor willfully attempted *in any manner* to evade or defeat payment of taxes for tax years 1987 through 1992. The Second Circuit has recently held that the "willfulness exception consists of a conduct element (an attempt to evade or defeat taxes) and a *mens rea* requirement (willfulness)." *In re Tudisco*, 183 F.3d 133, 136 (2d Cir. 1999).

■ The burden of proof is the ordinary civil standard; the government must show by a preponderance of the evidence that the claim should be excepted from discharge. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Langlois v. United States*, 155 B.R. 818, 820 (N.D.N.Y.1993). We also bear in mind that exceptions to discharge are construed in favor of the Debtor. *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir.1996).

■ The Second Circuit has recently declined to decide whether more than a simple nonpayment of taxes is required to satisfy § 523(a)(1)(C)'s conduct requirement or whether § 523(a)(1)(C) "encompasses both acts of commission as well as culpable omissions." *In re Tudisco*, 183 F.3d at 137 (quoting *Bruner v. United States (In re Bruner)*, 55 F.3d 195, 200 (5th Cir.1995) (holding that § 523(a)(1)(C) "encompasses both acts of commission as well as culpable omissions")). However, the Second Circuit, in *Tudisco*, has joined the majority of the courts in holding that a failure to pay a known tax duty is, at a minimum, "relevant evidence which a court should consider in the totality of conduct to determine whether . . . the debtor willfully attempted to evade or defeat taxes." *Dalton v. IRS*, 77 F.3d 1297, 1301 (10th

---

**6.** The debtor contributed several items of personal property, including furniture, household items, clothing, furs, jewelry, musical instruments, silverware, china, crystal, paintings, books, collectibles, electronic audio and video equipment, computers, appliances and other property. (T1 at 157–180, Ex. J.)

Cir.1996). Nonpayment of tax coupled with concealment of assets or income, or a pattern of failure to file returns is sufficient to establish conduct aimed at "evading or defeating taxes." *See, e.g., In re Tudisco,* 183 F.3d 133 (nonpayment of tax, failure to file and submission of false affidavit to employer intended to establish exemption from withholding), *In re Birkenstock,* 87 F.3d 947 (nonpayment of tax, failure to file, creation of shell trust); *Dalton v. Internal Revenue Service,* 77 F.3d 1297 (concealing assets and underestimating ownership interest in property on bankruptcy schedule).

█ The Second Circuit has interpreted "willfully" for purposes of § 523(a)(1)(C) to require that debtor's attempts to avoid his tax liability be undertaken "voluntarily, consciously or knowingly, and intentionally." *In re Tudisco,* 183 F.3d 133, 137 (2d Cir.1999) (quoting *Dalton,* 77 F.3d at 1302).

█ Because direct proof of intent is rarely found, courts look to circumstantial evidence to determine debtor's intent. Such evidence may include evidence outside the tax years in question, "if sufficiently related in time and character to be probative." *In re Birkenstock,* 87 F.3d at 951 (quoting *United States v. Birkenstock,* 823 F.2d 1026, 1028 (7th Cir.1987)).

█ In the case at bar, there are a number of facts which, when taken together, show that the Debtor intended to evade or defeat taxes. Debtor, an attorney with an LL.M. in tax, despite the knowledge that he was required to pay estimated taxes and to fully pay his tax liabilities by April 15th of each year (T1 at 137), did not pay his federal income taxes for thirteen years, except to the extent tax was withheld by his employers, and his tax obligation has accumulated over this period, resulting in total tax liabilities to date of $228,277.60. (Govt.Ex. A1–A2.) Debtor failed to fully pay his tax liabilities for tax years 1986 through 1998, with the exception of tax years 1995 through 1997 when his employer was withholding taxes from his wages. (Govt. Ex. C, D9–D11; T1 at 131–32.)

Second, Debtor failed to timely file returns for tax years 1986, 1987, 1989, 1996, 1997 and 1998. It was only from tax years 1990 through 1995 that Debtor timely filed his tax returns. However, during this period, Debtor was negotiating three separate offers-in-compromise with the IRS and was required to comply with Internal Revenue Service Regulations, which included timely filing returns as a condition of acceptance of the offers-in-compromise. Moreover, Debtor attempted to thwart or at the very least delay the collection of his tax liabilities by filing serial offers-in-compromise from 1990 to 1995. *In re Myers,* 216 B.R. 402 (6th Cir. BAP 1998) (finding that § 523(a)(1)(C)'s modifying phrase "in any manner" is "broad enough to encompass attempts to thwart the payment of taxes"). The undisputed evidence shows that Debtor, an intelligent, highly educated tax attorney who was familiar with the offer-in-compromise process, succeeded in delaying the Government's collection efforts for more than five years by submitting offers which were clearly too low in relation to the tax obligations owed.[7] In addition, Debtor knew that, while the offers were pending, he could forestall collection of all tax liabilities under consideration, which permitted him to delay filing bankruptcy and seeking discharge of his

7. Under Debtor's offer, as revised, he was to pay only $12,916 to compromise total reported unpaid liabilities of $85,241 for the tax years 1987 through 1992 (Govt.Ex. C). Based on Debtor's reported income, this was not a legitimate offer.

taxes. (Govt. Ex. F1–G1 (¶ 4), H1, H2 (¶ 7(d)).)

Third, Debtor, aware of his remainder interest at the time of filing the bankruptcy petition, failed to disclose this interest to this Court despite the fact that Schedule B explicitly asked whether Debtor had any contingent or future interests at the commencement of the case. Debtor's failure to list his remainder interest in the Trust prevented the Government from asserting a secured claim position based on tax liens that had attached to all of Debtor's property.

As the Government pointed out at trial, had the Debtor reported his remainder interest in the bankruptcy schedules, even if he had reported the value as zero, the Trustee and the Government would have had an opportunity to inquire as to its value and the Government would have asserted a secured claim on this interest, permitting the Government to receive the value of the remainder interest at the time the interest matured post-petition. (T3 at 47–54.) As a general matter, federal tax liens survive bankruptcy and, to the extent that they are secured by the liened property, they remain enforceable against the liened property, despite the fact that the underlying obligations are dischargeable. *See, e.g., In re Isom,* 901 F.2d 744 (9th Cir.1990); *In re Dillard,* 118 B.R. 89 (Bankr.N.D.Ill.1990); *U.S. v. Alfano,* 34 F.Supp.2d 827 (E.D.N.Y.1999). The omission further enabled the Debtor to receive $718,000 in distributions, which he channeled to various accounts and ultimately a limited partnership in Nevada in an attempt to conceal his assets from the Government and thwart the collection of his tax obligations.

Fourth, Debtor did not even fully pay his $88,000 tax liability for the 1998 tax year when he received over $718,000 in distributions from the Trust, nor did he even make any effort to pay his tax obligations owed for prior years.

Debtor argues that an inference of intent to evade or defeat taxes should not be drawn from these facts, for the following reasons.

First, Debtor contends that he did not pay his 1998 tax obligations because he had future obligations, and because he was attempting to reach a settlement with the Government on prior taxes. (T1 at 114–115, and at 118–119.) The existence of future obligations is no excuse not to pay current tax obligations, *In re Haesloop,* 2000 WL 1607316 (Bankr.E.D.N.Y.2000), and it is not clear how a desire to reach a settlement on prior taxes would preclude payment of current taxes. Additionally, Debtor argues that the reason he did not pay his prior tax obligations when he received the Trust distributions was that he thought these prior taxes were discharged already. However, this is a weak argument, as Debtor knew that his 1994 tax liability was a priority tax liability and did not attempt to challenge it in his complaint for Adversary Proceeding No. 197–1399. (Govt.Ex. R1.)

Second, Debtor argues that the reason he did not pay his taxes each year was because, by the time April 15 came around each year, he did not have enough money on hand to pay his taxes. (T1 at 9, 102, 109–110.) This argument fails to convince this Court. Debtor did have the funds to pay his tax liabilities. The evidence shows that Debtor could have easily paid his tax obligations had he spent less money on tuition payments, gifts, charitable contributions and child support payments in excess of his obligations under the court-ordered arrangement with his ex-wife. From 1986 to 1999, Debtor spent $420,000 on tuition payments, spent approximately $62,725 on excess child support payments, made charitable contributions in the

amount of $68,389, gave gifts to his ex-wife and close friends totaling $72,500 and made highly speculative investments in which he lost $269,000. In comparison, Debtor accumulated total tax liabilities of $288,277.60 of which a significant portion, if not all, could have been paid within a reasonable amount of time had Debtor refrained from spending all his money on the above-listed discretionary expenses. In a recent case, under a similar set of facts, the Debtor, an attorney, channeled money that could have been used for his tax liabilities to personal expenses, such as paying his daughter's "Ivy League" education, maintaining a country house and paying his wife's tax liabilities. *In re Haesloop,* 2000 WL 1607316 (Bankr.E.D.N.Y.2000). In that case, the court found that had debtor made reasonable adjustments to his standard of living he could have easily paid his tax debt in full and held that the debtor willfully attempted to evade or defeat his tax obligations within the meaning of § 523(a)(1)(C). The fact that the debtor's income, in *Haesloop,* was $275,000 per year and Debtor's income, on average during the relevant period, was $67,000 per year, makes no difference. Had Debtor refrained from spending more than half his income on discretionary expenses such as private education and excess child support payments, he would have easily been able to pay his tax obligations within a reasonable period of time.

Furthermore, this Court rejects Debtor's related argument that he led a frugal modest lifestyle and that he was faced with "Hobson's Choice" between payments of his tax obligations on the one hand, and financial contributions and support to his family on the other. (Debtor's Post–Trial Memorandum of Law, at 5.) Courts have held that a debtor has willfully evaded his taxes under § 523(a)(1)(C) where he had the wherewithal to pay his tax obligations but chose to apply his income to discretion-

ary expenses such as private education for his children and financial support to his family members. *In re Haesloop,* 2000 WL 1607316, *In re Wright,* 191 B.R. 291, 295 (S.D.N.Y.1995) (debtor spent "thousands of dollars" on tuition payment for Ivy League education for his children, paid substantial credit card charges of wife and daughter, and helped support his brother and mother); *In re Eleazar,* 271 B.R. 766 (Bankr.D.N.J.2001) (debtor paid substantial credit card debt of his family member). Debtors do not owe a duty to supply their children with nonessential luxuries such as private education absent some evidence that the debtor's children would not be served by a public school education. *In re Griffieth,* 209 B.R. 823, 828 (Bankr. N.D.N.Y.1996).

Debtor claims that as an Orthodox Jew he has an obligation to send his children to Jewish day schools. (T1 at 113.) While there is no case directly addressing whether a debtor has a constitutional right to send his children to religious school, courts have held that a debtor does not have a constitutional right to make charitable contributions under the free exercise clause of the First Amendment. *In re Griffieth,* 209 B.R. 823, 828 (Bankr. N.D.N.Y.1996), *Church of Lukumi Babalu Aye., Inc. v. Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). This Court sees no basis for finding a right, constitutional or otherwise, to pay religious school tuition in preference to tax obligations.

If this Court were to permit every debtor to receive a discharge of his or her tax liabilities every time a debtor decided to spend income on discretionary personal expenses at the expense of tax obligations, claiming that he or she was faced with conflicting monetary obligations, then § 523(a)(1)(C) would be meaningless. In

this case, Debtor had the wherewithal to pay his taxes had he not spent most of his income on discretionary expenses and taken affirmative steps, after receipt of distributions from his father's trust, to place his assets beyond the reach of creditors.

This is not a case where Debtor was ignorant of his tax obligations. Indeed, like the debtors in *Haesloop* and *Wright,* Debtor, an intelligent attorney with an LL.M. in tax, clearly knew he had a duty to pay his tax obligations and voluntarily and consciously chose to ignore these obligations. At trial, the Debtor testified that "the IRS came at the bottom of his list along with three or four hundred thousand worth of other creditors" (T3 at 24) because they didn't "scream loud enough" (T3 at 24) and that he would pay "whichever creditors were yelling the loudest" (T2 at 16) and that his "landlord, car payments and child support payments" were timely made so that his "ex-wife wouldn't yell at me." (T2 at 16.)

Section 523(a)(1)(C) renders nondischargeable attempts in any manner to evade or defeat a tax. The totality of the Debtor's conduct here constitutes a scheme of willful evasion and conduct to defeat the payment of his tax liabilities.

In conclusion, the Court, having considered the totality of Debtor's conduct, finds that Plaintiff willfully attempted to evade or defeat his tax obligations within the meaning of § 523(a)(1)(C) of the U.S. Bankruptcy Code. Accordingly, the principal amount of Debtor's outstanding tax debt and the interest and penalties hereon, for each of the tax years in dispute, 1987 through 1992, are non-dischargeable.

*Pursuant to 11 U.S.C. § 727(d)(2), Debtor's Discharge Should Be Revoked*

Section 727(d)(2) of the United States Bankruptcy Code (11 U.S.C.) provides in pertinent part:

(d) On request of the trustee, a creditor, or the United States trustee, and after notice and hearing, the court shall revoke a discharge granted under subsection (a) of this section if—

(2) the debtor acquired property that is property of the estate, or became entitled to acquire property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee.

 The burden of proof under § 727(d)(2) is preponderance of the evidence, and not, as Debtor's counsel argues, the clear and convincing standard. Although this Court, in *In re Kirschner,* 46 B.R. 583 (Bankr.E.D.N.Y.1985), held that the appropriate standard in a § 727(d)(1) case was clear and convincing evidence, the U.S. Supreme Court in *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), applied the preponderance of evidence standard to dischargeability issues under 11 U.S.C. § 523. Several other courts have subsequently applied the preponderance of evidence standard to discharge revocation proceedings under 11 U.S.C. § 727 because similar considerations of intent are involved in both provisions. *See, e.g., In re Serafini,* 938 F.2d 1156 (10th Cir.1991); *In re Bowman,* 173 B.R. 922 (9th Cir. BAP 1994); *In re Sylvia,* 214 B.R. 437, 440 (Bankr.D.Conn. 1997); *In re Barr,* 207 B.R. 168 (Bankr. N.D.Ill.1997); *In re Trost,* 164 B.R. 740 (Bankr.W.D.Mich.1994); *In re Wolfson,* 139 B.R. 279 (Bankr.S.D.N.Y.1992).

The Government contends that Debtor's remainder interest in the Trust was property of the estate at the time of the filing of the petition, and should have been disclosed on Schedule "B". (Plaintiff's Post–Trial Brief, at 40.) In addition, the Government asserts that Debtor failed to re-

port acquisitions of cash from and maturing of Debtor's remainder interest to the Court or the Trustee. (Plaintiff's Post–Trial Brief, at 40.) In response, Debtor advances two arguments. First, he contends that his interest in the Trust was both subject to a discretionary power of appointment by the income beneficiary, Lorraine Colish, and also non-assignable and thus was not property of the estate. (Debtor's Post–Trial Memorandum of Law, at 10–14.) Second, he argues that he relied on his attorney's advice in not listing his remainder interest in the Trust in the schedules of his bankruptcy petition, and therefore that his failure to disclose the interest in his bankruptcy filing was not "knowing and fraudulent". (Debtor's Post–Trial Memorandum of Law, at 10–14.)

■ Both Debtor's counsel and the Government agree that the scope of property of the estate under § 541 of the U.S. Bankruptcy Code includes "all legal or equitable interests of the debtor in property as of the commencement of the case". 11 U.S.C. § 541. This provision has been broadly construed. *In re Yonikus*, 996 F.2d 866, 869 (7th Cir.1993) ("every conceivable interest of the debtor, future, non-possessory, contingent, speculative, and derivative, is within the reach of § 541"). Although § 541 defines the scope of the property of the estate, applicable state law determines the issue of whether debtor has a legal or equitable interest in property. *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

■ Both parties also agree that since the Trust was established in Michigan, Michigan law applies. Under Michigan law, the trustee holds legal title to the corpus and the beneficiaries hold the equitable interest. *In re Page*, 239 B.R. 755, 763 (Bankr.W.D.Mich.1999). In the case at bar, the Trust provided that testator's wife, Lorraine Colish, would be the income beneficiary of the Trust assets during her life, and Debtor and his sister, Julie Colish, had remainder interests in the trust assets which would mature on the death of Lorraine Colish. The Trust contained two provisions which are of particular importance in this case. First, Section 5B.3(d) of the Trust provides that Lorraine Colish had a special power to appoint, only by specific reference in her Will, the trust assets to any of testator's children or their descendants as she would determine in her sole discretion[8]. Second, Section 7.4 of the Trust contains a clause which essentially prevents the assignment or transfer of the beneficiary's interest in the trust's principal and income to his beneficiaries unless the trustee determines that such transfer is in the best interest of the beneficiary.

■ Debtor relies on two cases, *In re Knight*, 164 B.R. 372 (Bankr.S.D.Fla.1994), and *In re Hicks*, 22 B.R. 243 (Bankr. N.D.Ga.1982), for the proposition that where an interest is subject to a testamentary special power of appointment, the potential beneficiary does not have an interest that would be property of the estate. (Debtor's Post–Trial Memorandum of Law, at 10–13.) In *Knight*, the debtor scheduled certain property as contingent unvest-

---

**8.** Section 5B.3(d) of the trust states: *"Spouse's Special Power.* My spouse shall have a special testamentary power of appointment to appoint outright, in a trust or otherwise, with such estates, powers, limitations or conditions as she shall determine, to any one or more of my children or to their descendants (...) such amounts as my spouse, in my spouse's sole discretion shall determine, provided this power shall not be exercised for the purpose of discharging my spouse's legal obligations. (...) This power shall only be exercisable only by specific reference thereto in my spouse's will."

ed interests in trusts and the issue was whether these trust interests were included as property of the estate. Debtor's parents established two separate trusts, the Dorothy Trust and the Charles Trust, which was later divided into Charles A trust and Charles B Trust. The Dorothy Trust provided that upon the death of Dorothy, the life beneficiary, the trust principal would be distributed equally to debtor and his sister, if they were alive. The Charles A Trust provided that Dorothy would receive all her income from this trust during her life and also permitted Dorothy, by power of appointment exercisable by Dorothy alone and in her sole discretion, to name debtor or his sister as beneficiaries. The court held that debtor's interest in the Charles A Trust was too remote to have value and did not constitute property of the estate. *In re Knight,* 164 B.R. at 376. However, the debtor's interest in the Dorothy Trust was held to be property of the debtor's estate, despite the existence of contingencies, which the court acknowledged reduced the actual value of the interest.

In *Hicks,* the debtor alleged that he had a vested remainder interest in his father's trust. Debtor's father died ten years prior to debtor's filing of his bankruptcy petition and debtor's mother was given a life estate in the residuary trust as well as a power of appointment, which enabled her to direct the trustee to turn over the trust assets to any descendant of her late husband. As of the bankruptcy filing date, the mother had not exercised her power of appointment and was still alive. The court held that debtor's interest would only vest upon the occurrence of two contingencies: 1) the mother's exercise of the power of appointment naming debtor as beneficiary and 2) the debtor surviving his mother. The court reasoned that it could not compel debtor's mother to exercise her power of appointment naming him as beneficiary

and further that under Georgia law, the debtor's interest would only vest on the death of the mother, the life tenant. *In re Hicks,* 22 B.R. at 245.

The case at bar is distinguishable from the above cases. First, unlike *Knight,* the debtor in this case was actually named as a beneficiary under the Trust and was to receive 50% of the trust assets upon the death of the life beneficiary, Lorraine Colish. (Govt. Ex. W, X1, X2, Z1 and Z2.) In contrast, in *Knight,* the Charles A Trust did not provide that debtor was to receive the principal or income upon the death of the life beneficiary (unlike the Charles Part B Trust and the Dorothy Trust, which were held to be property of the estate), but merely permitted the life beneficiary to name any descendant of the testator upon her death, pursuant to the power of appointment. Second, Lorraine Colish, unlike the life beneficiaries in both *Knight* and *Hicks,* actually did exercise her power of appointment in her Last Will, prior to the filing of the bankruptcy petition. On January 8, 1985, Lorraine Colish executed a Last Will and Testament under ITEM XVII in which she refrained from exercising any power of appointment that she may have had at the time of her death. (Govt.Ex. CC1.) Further, on October 29, 1997, she executed a First Codicil to her Last Will and Testament in which she did not change ITEM XVII in the Last Will. (Govt.Ex. CC2.) Consequently, the Debtor's argument that the Court could not compel the life tenant to refrain from divesting Debtor of his interest in the Trust or to name him as beneficiary is unavailing: in this case there was no need to do so. Third, the court in *Hicks* placed emphasis on the fact that under Georgia law, the debtor's interest would only vest on the death of the life tenant, who happened to be still alive at the time of the filing of

the bankruptcy petition. Here, in contrast, although the life beneficiary was still alive at the time of the bankruptcy filing, the Debtor's interest had already vested, because under Michigan law, as the Government properly notes, a remainderman's interest vests at the time of the death of the testator, not the life tenant. (United States Post–Trial Brief, at 43.) *In re Hurd's Estate,* 303 Mich. 504, 6 N.W.2d 758, 760 (1942) (listing cases in support of the long-standing preference for vested estates); *In re Childress Trust,* 194 Mich. App. 319, 486 N.W.2d 141, 143 (1992).

For these reasons, this Court concludes that Debtor's interest in the Trust was not too remote or speculative to not be included in the property of the estate. Furthermore, although subject to possible divestment by the life beneficiary, Debtor's interest was a vested remainder interest. Even if Debtor's interest was found to be a contingent remainder interest, this alone would not preclude it from being property of the estate, provided the interest was not circumscribed by a spendthrift provision. *See, e.g., In re Neuton,* 922 F.2d 1379 (9th Cir.1990) (fact that debtor's interest in trust was contingent on surviving life tenant did not preclude it from being property of estate); *In re Dias,* 37 B.R. 584, 586–587 (Bankr.D.Idaho 1984) (a beneficial interest is an equitable interest under § 541(a)(1) despite the fact that at the time of filing petition it was contingent).

Debtor further argues that pursuant to both Section 7.4 of the Trust and § 541(c)(2) of the U.S. Bankruptcy Code, his interest in the Trust was non-assignable and not reachable by his creditors and thus should not be included in the property of the estate.[9]

Michigan law recognizes the validity of restrictions on the transfer of beneficial interests in spendthrift trusts. *In re Edgar Estate,* 137 Mich.App. 419, 357 N.W.2d 867 (1984). The United States Supreme Court has ruled that in accordance with the plain meaning of § 541(c)(2), property is excluded from the estate when 1) debtor has a beneficial interest in a trust, 2) there is restriction on the transfer of such interest, and 3) the restriction is enforceable under applicable nonbankruptcy law. *Patterson v. Shumate,* 504 U.S. 753, 757–758, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

This Court finds that the spendthrift provision in the Trust constitutes a valid spendthrift provision. Under Michigan law, the provisions of the trust instrument must demonstrate grantor's intent to "provide a fund for the maintenance of the beneficiary and at the same time to secure the fund against his improvidence or incapacity." *In re Barnes,* 264 B.R. 415 (Bankr.E.D.Mich.2001) (quoting *Black's Law Dictionary* ). In the case at bar, the main purpose of the spendthrift clause was to provide a source of income for the testator's wife, Lorraine, and secure the fund against any improvidence or incapacity of the wife or other beneficiaries by delegating complete control over the distribution of the funds to the trustee.[10] As a result,

---

**9.** § 541(c)(2) states in relevant part:
(c)(1) Except as provided in paragraph (2) of thus subsection, an interest of the debtor in property becomes property of the estate…notwithstanding any provision in any agreement, transfer instrument, or applicable nonbankruptcy law
(c)(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

**10.** The spendthrift clause clearly states that the principal and income of the trust are to be free from interference of the creditors of any beneficiary and not subject to assignment or anticipation by any beneficiary unless the

in the case at bar, Debtor's vested remainder interest in the spendthrift trust would be excluded from the estate pursuant to § 541(c)(2), were it not for the effect of federal tax law.

The Bankruptcy Code recognizes federal tax law as "applicable nonbankruptcy law" for purposes of enforcing a § 541(c)(2) exemption. *Patterson,* 504 U.S. at 758–759, 112 S.Ct. 2242 ("Plainly read, the provision encompasses any relevant nonbankruptcy law, including federal law"); *United States v. Dallas National Bank,* 152 F.2d 582, 585 (5th Cir.1945) (holding that Internal Revenue statutes are federal laws). It is well-settled that courts draw from "Federal tax lien law as a source of 'applicable nonbankruptcy' law that overrides any state law restriction on the Government's reaching the debtor's rights." *In re Lyons,* 148 B.R. 88, 93 (Bankr.D.D.C. 1992); *see, e.g., Bank One v. United States,* 80 F.3d 173, 176 (6th Cir.1996) ("Under the great weight of federal authority, however, such restraints on alienation [referring to spendthrift provisions in a trust] are not effective to prevent a federal tax lien from attaching under 26 U.S.C. § 6321.") Section 6321 of the Internal Revenue Code (26 U.S.C.) provides that "if any person liable to pay a tax neglects or refuses to pay the same after demand, the amount shall be a lien in favor of the United States upon *all* property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321; *United States v. National Bank of Commerce,* 472 U.S. 713, 719–20, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985) (the language of § 6321 is broad and is reflective of a congressional intent to "reach every interest in property that a taxpayer may have"). Thus, although the spendthrift

clause prevented creditors of the Debtor from reaching his remainder interest in the Trust, the United States' federal tax lien can be satisfied against any income distributions of the Trust provided that the liens attached to Debtor's property prior to the Debtor's bankruptcy filing, the liens were properly filed federal tax liens and Debtor's remainder interest constitutes a legal or equitable right defined as "property" or "rights to property" subject to attachment under federal law. *Jones v. Internal Revenue Service,* 206 B.R. 614, 621 (Bankr.D.D.C.1997) (observing that certain property has "a split personality by remaining property of the estate for purposes of federal tax claims even though it is not property of the estate for purposes of other creditors' claims"); *In the Matter of Orr,* 180 F.3d 656 (5th Cir.1999) (holding that federal tax liens attached to future distributions from the spendthrift trust at the time of the creation of the lien, which predated and survived the bankruptcy, and not at the time that each distribution was made).

 In this case, the United States filed Notices of Federal Tax Liens for each of the years 1987 through 1993, thereby making each of those liabilities secured claims in the Chapter 7 case. (Govt.Ex. A1, A2.); 11 U.S.C. § 506(a). Generally, the federal tax lien arises at the time the assessment is made and continues until the liability is satisfied or becomes unenforceable by reason of lapse of time. 26 U.S.C. § 6332; *United States v. City of New Britain,* 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954) (describing federal tax lien as general lien when attached at the time of assessment to all of the taxpayer's property, was thus perfected). Furthermore, under Michigan law, a debtor's interest in a

---

trustee determines this to be in the best interest of the beneficiary. See Section 7.4 of the

Trust (Creditor's Clause).

spendthrift trust, be it contingent or remainder, is "property" or "rights to property" under 26 U.S.C. § 6321. *Bank One v. United States*, 80 F.3d at 175. In addition, the Government's lien on the property of the taxpayer, when taxpayer fails to pay taxes after assessment, notice and demand, attaches to all property and rights to taxpayer's property, including property subsequently acquired by taxpayer. 26 U.S.C.A. §§ 6321, 6322.

As a result, the federal tax liens attached to Debtor's vested remainder interest in the Trust at the time of the creation of the liens, which predated the bankruptcy, and the liens attached to Debtor's after-acquired property, namely. the maturing of Debtor's remainder interest and the resulting distributions from the Trust post-discharge.

The only question remaining before this Court is whether Debtor knowingly and fraudulently failed to report to the Court or surrender to the Chapter 7 Trustee his remainder interest in the Trust and the cash and other property distributions he received from the maturing of his remainder interest pursuant to § 727(d)(2) of the U.S. Bankruptcy Code.[11]

To find the requisite degree of fraudulent intent under § 727(d)(2), the court must find the debtor knowingly intended to defraud, or engaged in such reckless behavior as to justify the finding of fraud. *In re Puente*, 49 B.R. 966, 969 (Bankr.W.D.N.Y.1985). The requisite fraudulent intent or recklessness may be proven by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or creditors or that the debtor acted so recklessly in not reporting the asset that fraud is implied. 4 *Collier on Bankruptcy* ¶ 727.15[4] (1992). As direct evidence of the debtor's intent can rarely be found, the courts have relied on the inferences drawn from a course of conduct and all surrounding circumstances in finding fraudulent intent. *Matter of Reed*, 700 F.2d 986, 991 (5th Cir.1983) (debtor's whole pattern of conduct supports the court's finding of fraudulent intent); *In re Kindorf*, 105 B.R. 685, 689 (Bankr.M.D.Fla.1989) (in determining debtor's actual intent, court considered all circumstances, including debtor's systematic transfer of excess of $143,000 to his wife, comprising his salary, income from partnership interest and gifts from parents, as well as debtor's failure to disclose the existence of a Swiss bank account in his schedules in which he held a substantial sum), *In re Yonikus*, 974 F.2d 901, 905 (7th Cir.1992).

In the case at bar, Debtor became aware of his remainder interest in his father's estate soon after his father's death on January 11, 1981. (T1 at 140.) On December 20, 1997, Debtor's mother, Lorraine Colish, died. Despite knowledge of his remainder interest in the trust, debtor failed to disclose his interest in the schedules filed with this Court. Rather, Debtor, on Schedule "B" of the bankruptcy petition,

---

11. Although there is disagreement whether Section 727(d)(2) applies only to post-petition entitlement or receipt of property or whether it applies to both pre-petition property and post-petition property, this issue does not affect this Court's analysis because the debtor's pre-petition remainder interest in the Mannie S. Colish Trust actually matured, and the proceeds of the trust were distributed to him, after his discharge in bankruptcy. Compare *In re Argiannis*, 183 B.R. 307 (Bankr.M.D.Fla. 1995), *In re Puente*, 49 B.R. 966, 968 (Bankr. W.D.N.Y.1985) (holding that Section 727(d)(2) applies only to entitlement or acquisition of post-petition property) with *In re Barr*, 207 B.R. 168 (Bankr.N.D.Ill.1997) (holding that § 727(d)(2), by its plain reading, is not limited to property acquired post-petition, but extends to property acquired pre-petition).

expressly denied possessing any "future" interest or any "contingent and non contingent interests in estate of a decedent...or trust." (Gov. Ex. P. Declaration Concerning Debtor's Schedules.) Debtor testified that he "didn't read the particular item[s] concerning future interest, life estates, contingent and noncontingent interest in estates" and that "had [he] read that, [he] would have never signed this petition." (T1 at 147.) Furthermore, Debtor claims that he told his attorney, William Bryk, about his interest in the Trust and that he decided not to disclose such interest on Schedule B of the bankruptcy petition upon advice of counsel. (T1 at 148.) These explanations are not credible and, in addition, lack merit.

It is well established that the advice of counsel is a complete defense to a charge of fraud where a full and fair disclosure of the facts is made. *Jones v. Gertz*, 121 F.2d 782, 784 (10th Cir.1941); *In re Topper*, 229 F.2d 691 (3rd Cir.1956); *In re Stone*, 52 F.2d 639 (D.N.H.1931). However, the reliance must be in good faith and any protection based on reliance on debtor's counsel will only act as a protection to the extent the reliance was reasonable. *In re Weber*, 99 B.R. 1001, 1018 (Bankr.D.Utah 1989).

In *Jones*, the debtor was to provide architectural services on certain public construction contracts but later filed bankruptcy because he did not have sufficient funds to pay his necessary travel expenses to supervise the work. Debtor was owed a small sum from Adams County and the City of Walden ($461 and $95 respectively), which he assigned to a bank and a finance corporation. Debtor relied on his attorney who did not list the sums on his schedules because he thought the "assignments conclusive" and the debtor had no interest in the fund. The court held that debtor failed to list the fund because he honestly believed that there was nothing "coming to him from the assignments" rather than because he wanted to defraud the creditors. *Jones v. Gertz*, 121 F.2d at 784. In *Topper*, the debtor had no assets at the time he filed bankruptcy or after his discharge was denied. *In re Topper*, 229 F.2d at 692. Although debtor owed money to a few retail accounts, and two small loan companies, he only listed the debt owed to his landlord. As explanation, debtor said he only wished to discharge the debt to the landlord but that he intended to pay his other creditors. The court found that debtor had little to gain from the omission because debtor did not have any assets, and held that there was an absence of fraudulent intent necessary for denial of discharge due to false oath under Title 18 U.S.C.A. Section 152. In a more recent case, the debtor's attorney failed to list certain debts on the bankruptcy petition because he was either confused about the questions, or because he considered the debts to be family-related and of no value. *In re Ellingson*, 63 B.R. 271, 275–276 (Bankr.N.D.Iowa 1986). However, debtor and his attorney promptly amended the schedules after they learned of their errors at the first creditors meeting. *Id.* at 276. The court held that creditors had failed to show that material omissions from the schedules were made with fraudulent intent pursuant to 11 U.S.C. Section 727.

The case at bar is clearly distinguishable from the above cases. Unlike the debtor in *Topper*, who had no assets before and after the discharge, Colish concealed his interest in the Trust despite the near certainty that he would eventually come into possession of large monetary distributions. Similarly, the sums owed to the debtor in *Jones* pale in comparison to the distributions from the Trust, and, in addition, the debtor in *Jones* had actually assigned his

interest in these funds to other entities, unlike Colish. Had the Debtor taken a similar approach to the debtor in *Ellingson* and voluntarily divulged his remainder interest in the Trust subsequent to his discharge, and prior to dissipating the Trust proceeds, this Court might have been more sympathetic to Debtor's pleas of mistake and reliance on counsel. However, the Government only became aware of Debtor's interest in the Trust during settlement negotiations with the Debtor for Adversary Proceeding No. 97–1399. (T4 at 18–19.) At trial, Debtor and his attorney, Mr. Bryk, submitted conflicting testimony concerning whether Debtor's trust interest was divulged to Mr. Bryk. Debtor testified that he disclosed his remainder interest to Mr. Bryk and Mr. Bryk told him he did not need to report such interest. (T1 at 148.) In contrast, Debtor's attorney, Mr. Bryk, testified that he never discussed a family trust nor did he remember the debtor informing him about any interest in a trust (T2 at 99–101 and T2 at 102, 103.) Attorney Bryk further testified that he typically made inquiries concerning items 18 and 19 of Schedule "B" (concerning future interests and interests in trusts). (T2 at 100.) It is unlikely that an attorney who considers himself a specialist in consumer bankruptcy law, and who has represented debtors in over one hundred cases (some involving substantial tax liabilities) would expose himself to malpractice liability by not listing Debtor's interest in a trust in the petition. (T2 at 103.) Given the conflicting testimony, this Court chooses to give credence to Mr. Bryk's testimony, especially in light of Debtor's conduct subsequent to receiving distributions from the Trust in January.

On January 13, 1998, Debtor received nearly $500,000 from the sale of land pertaining to the Trust and immediately thereafter engaged in a series of unexplained transfers and reallocation of these funds to several banks and accounts. (T1 at 169.) From January 1998 through December 1998, Debtor received distributions from the Trust totaling approximately $713,000. In addition, in March, 1998, Debtor created a Nevada Limited Partnership which he named Phoenix Samson Associates, L.P. and into which he transferred his Spencer Trask account, his newly opened Citibank accounts, various partnership interests in his father's Trust as well as practically all his personal property, all totaling $740,625.[12] (Govt. Ex. J.) When asked at trial why he created this partnership in Nevada and why he transferred virtually all his property into it, Debtor replied that he was concerned about potential suits from clients. (T1 at 155.) This explanation is dubious at best. The Debtor's testimony in this regard was glib and lacking in credibility. Moreover, given the Debtor's history with the Internal Revenue Service, detailed above, any assertion that this convoluted series of transfers was not motivated in substantial measure by an intent to frustrate the Government's collection efforts defies credulity. In addition, the fact that Debtor did not pay his pending taxes for prior years nor even fully pay his 1998 taxes, when he received the distributions from the Colish Trust, provides additional support for an inference of fraudulent intent. Debtor's claims that he did not read the schedules carefully, and relied on his attorney's advice are ultimately not credible in light of Debtor's conduct and the fact that Debtor

---

12. His personal property included: "All furniture, household items, clothing, furs jewelry, musical instruments, silverware, china, crystal, paintings, antiques, books, collectibles, electronic audio and video equipment, computers, telephones, appliances, and all other personal property..." (T1 157–180, Govt. Ex. J.)

is an attorney, with an LL.M. in tax, and a sophisticated businessman.

Based on all the circumstances described above, this Court finds that the Government has carried its burden of proof under the preponderance of evidence standard enunciated in *Grogan v. Garner* and that Debtor knowingly and fraudulently failed to report to the Court or surrender the Chapter 7 Trustee his remainder interest in the Trust and the cash and other property distributions he received from the maturing of his remainder interest pursuant to § 727(d)(2) of the U.S. Bankruptcy Code.

## Conclusion

For all of the foregoing reasons, the United States has sustained its objection to the Debtor's discharge pursuant to § 727(d)(2). Accordingly, Debtor's discharge is REVOKED. Furthermore, the United States has sustained its objection to the dischargeability of Debtor's outstanding tax debt for each of the tax years in dispute, 1987 through 1992, pursuant to § 523(a)(1)(C). Accordingly, Debtor's outstanding tax debt, and interest and penalties thereon, for the tax years 1987 through 1992, are non-dischargeable.

IT IS SO ORDERED.