**In re Ronald M. EPSTEIN, DDS, Debtor.**

**Ronald M. Epstein, DDS, Plaintiff,**

v.

**Internal Revenue Service, Defendant.**

Bankruptcy No. 01–15349–608.
Adversary No. 01–1400–608.

United States Bankruptcy Court, E.D. New York.

Jan. 12, 2004.

Wendy J. Kisch, Barry E. Reiferson, Trial Attorneys, Tax Division, U.S. Department of Justice, Washington, D.C., for Defendant.

David Doyaga, Esq., Doyaga & Schaefer, Brooklyn, for Debtor, Plaintiff.

## DECISION AND ORDER

CARLA E. CRAIG, Bankruptcy Judge.

This matter comes before the Court on the complaint of Ronald Epstein ("Epstein" or "Debtor") to have his debt to the Internal Revenue Service ("IRS") for his assessed federal income tax liabilities for years 1988 through 1997 declared dischargeable and for a determination that such debt does not fall within the exception to discharge provided under 11 U.S.C. § 523(a).

### Procedural History

On April 23, 2001, Debtor filed a voluntary petition under Chapter 7 of title 11, U.S.C. ("Bankruptcy Code") and was granted a discharge of all dischargeable debts on August 20, 2001. (IRS Ex. E). The Debtor had filed a previous bankruptcy petition on June 3, 1994, under Chapter 11 of the Bankruptcy Code, which was converted to a Chapter 7 on July 6, 1995, and pursuant to which Debtor received a discharge on November 16, 1995. (IRS Ex. D; IRS Ex. G2).

On August 22, 2001, Debtor filed a complaint ("Complaint") commencing an adversary proceeding, wherein he requested that the Court issue an order declaring his assessed federal income tax liabilities for the years 1988 through 1997 dischargeable. (IRS Ex. F1). Trial was held on April 30, 2003, after which the parties made post-trial submissions.

This Court has considered all submissions and arguments relating to this matter, and all evidence adduced at trial, and the decision rendered herein constitutes the Court's findings of fact and conclusions of law.

## Jurisdiction

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334 and venue is proper pursuant to 28 U.S.C. § 1409(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## Facts

Unless otherwise indicated, the following facts are not in dispute.

### Debtor's Work Experience and Education

Dr. Epstein received a Bachelor's Degree from Fairleigh Dickinson University in 1971. Epstein then attended Columbia University Pharmacy School and graduated from New York University Dental School in 1978. (Joint Pre–Trial Order, "JPTO", or IRS Ex. K, ¶ 2 [1], Tr. 50.) Epstein was subsequently employed by the chief of the dental department at Brookdale Hospital for three years, following the completion of a one-year residency in Brookdale Hospital in Brooklyn, New York. (IRS Ex. K, ¶ 3.; Tr. 51.) In November of 1983, Epstein opened his own private dental practice, and remained in private practice until April 16, 2003, at which time he sold his practice. (IRS Ex. K, ¶ 4; Tr. 52.) Epstein is married to Caren Epstein and has one son, Brandon Epstein (IRS Ex. K, ¶ 1.) Starting in 2001, and continuing to the time of trial, Epstein and his family resided in a condominium, located at 257 Shinnecock Drive, Manalapan, New Jersey. (IRS Ex. H2, p. 6; Tr. 67.) Although the condominium was purchased by Epstein's father-in-law, Mr. Allen Katz ("Katz"), and is titled in Mr. Katz's name, Epstein pays the monthly mortgage payment of $2096, directly to the mortgage company. (Tr. 67.)

## Debtor's Expenses and Lifestyle

From the mid 1980s to the present, Epstein's expenses, other than normal living expenses, consisted of the following: 1) housing-related expenses; 2) automobile expenses; 3) tuition and miscellaneous expenses for his son; and 4) other miscellaneous expenses (vacations, gym fees, business office expenses, beauty parlor and gardener expenses.)

### A. Housing Expenses

Epstein moved several times from 1988 to the present, sometimes living in houses owned by his father-in-law and paying the mortgage, and sometimes renting a house. (IRS Ex. K, ¶ 15.) In 1989, Epstein moved into a single-family home located in Englishtown, New Jersey, which was purchased in the name of his father-in-law, Katz, and paid the mortgage of approximately $2,750 per month. (IRS Ex. H2, p. 5; Tr. 65.) In 1992, Epstein moved into another single-family home located in Morganville, New Jersey ("the Morganville House"), again purchased by Katz, and paid the utilities as well as the mortgage of approximately $3,700 per month. (IRS Ex. H2, p. 5; Tr. 65–66.) In addition, Epstein employed a gardener, paying him between $100 and $125 per month. (Tr. 66.) In 1995, Epstein instructed Katz to sell the Morganville House. (Tr. 66.) In 1995, in an effort to curtail his expenses after filing his first bankruptcy petition in 1994, Epstein moved into a single-family home in Marlboro, New Jersey for which Epstein paid a rent of $2,100 per month. (IRS Ex. H2, p. 5; Tr. 66–67, 82–83.) In 1999, Epstein moved into an apartment in Deal, New Jersey, and paid rent of approximately $1,800 per month; and then, in 2000, moved into another apartment and paid rent of $1,400 per month. (IRS Ex.

---

1. References to "Tr." refer to the transcript from the April 30, 2003 trial; References to "K, ¶" are to IRS Exhibit K, the Joint Pre-Trial Order.

H2, p. 6; Tr. 67.) In 2001, Epstein moved into his current home, a condominium purchased and titled in Katz's name, for which Epstein paid the mortgage of $2096 per month, directly to the mortgage company. (IRS Ex. H2, p. 6; Tr.67.)

## B. *Automobile Expenses*

Epstein testified that although he and his wife drive cars, they do not own, or lease the cars in their own names. (Tr. 61.) In the late 1980's, Epstein leased a BMW 318. (IRS Ex. K, ¶ 16; Tr. 62.) He testified that he did not remember whether it was leased in his own name, or that of someone else. (Tr. 62.) In the early 1990's, Epstein leased a Mercedes for $700 per month, and an Acura Integra for $300 per month. (IRS Ex. K, ¶ 16; Tr. 62, 82.) Epstein did not remember whether these cars were leased in his name or someone else's. (Tr. 61–62, 82.) After filing his first bankruptcy petition in 1994, Epstein returned the Mercedes, and began leasing a 1994 Infiniti for $469 per month. (IRS Ex. K, ¶ 16; Tr. 63, 82.) As of the time of trial, Epstein drives the 1994 Infiniti, which was leased in his mother-in-law's name and which his mother-in-law now owns due to Epstein's completion of all lease payments, and his wife drives an Infiniti, leased in 1999 by Epstein's mother-in-law, but, like the 1994 Infiniti, paid for by Epstein. (Tr. 61–63.)

## C. *Tuition and Miscellaneous Expenses for Epstein's Son*

From 1985 to 1990, Epstein's son attended, from first grade through the middle of fourth grade, a private religious school, East Midwood Day School, in Brooklyn, at a cost of between $5,000 and $10,000 per year. (IRS Ex. K, ¶ 17; Tr. 70.) From 1998 to 2000, Epstein's son attended the University of Maryland at College Park. (Tr. 70–71.) Epstein paid

approximately $9,000 or half of his son's first year tuition, and, in addition, paid for all the first-year room and board costs and the son's grandparents paid for the other half of the tuition cost of approximately $18,000. (Tr. 71–72.) During the second year, Epstein paid for all of his son's tuition, room and board costs. (Tr. 71.) Epstein's son neither took out any loans for his college expenses nor did he apply for financial aid for these expenses. (Tr. 71.) Epstein testified that although he "went to the bank" in an attempt to take out a loan for his son's tuition, they "told [him] based on [his] income, they weren't going to give [him] a student loan." (Tr. 71.) Epstein did not pursue any other potential source of financial assistance, such as direct assistance from the school. (Tr. 71.) In addition to the tuition, room and board costs, Epstein also gave his son between $100 and $500 per month for incidental expenses while he was in college. (IRS Ex. K, ¶ 19.) At the time his son turned 17 years old, Epstein leased a car for him, in the name of Epstein's sister-in-law, and paid $523 per month for the lease and the insurance. (Tr. 74.) Epstein continued to pay for the lease and insurance for five years, from 1998 to shortly before trial, at which time his son was 22 years old. (Tr. 74.) In addition to the above expenses, on January 25, 2001, Epstein also gave his son a $2,000 gift which was not listed in the schedules of the 2001 Petition, nor were the schedules later amended, following Epstein's deposition, to reflect this gift. (Tr. 75–77.)

## D. *Other Miscellaneous Luxury Expenses*

In addition to the above expenses, Epstein also incurred other substantial expenses related to various nonessential services and items. Beginning in December 1992, Epstein took his family on ski trips in Killington, Vermont, two to eight times a year, staying there for three to seven

days each time, and spending between $5,000 and $10,000 per year on these trips. (IRS Ex. K, ¶ 21.) Epstein also spent money on restaurant meals, a personal trainer for himself, beauty parlor appointments for his wife and the services of a gardener during the time he resided at the Morganville House. (Tr. 81–83, 66; IRS Ex. K, ¶ 23.) Epstein's business expenses included salaries of one full-time employee and one part-time employee in the running of his office. (Tr. 55–56.) As a result, Epstein had an obligation to file employer's quarterly income tax returns, which he failed to do, for 11 periods from 1999 through the first quarter of 2003. In addition, as of April 30, 2003, Epstein incurred liabilities for employment taxes, for the periods in which he filed the requisite employer tax returns, in the total amount of $172,570, which remain unpaid. (IRS Ex. P; Tr. 29–30.)

*Tax Return Filings: 1988–2002*

Beginning in September, 1983, following his decision to open a private practice, Epstein has been self-employed and, as a result, did not have any employer tax withholding during the tax years 1984 through 2002. (Tr. 59.) Epstein testified that he understood his tax obligations, including his obligation to timely file his tax return, make four estimated tax payments each year, and fully pay his federal tax liabilities by April 15th of each year. (Tr. 59–60, 100.) Epstein's federal tax returns were prepared by his accountant at the time, Jeffrey Laskey, from 1980 to 1983, then by Eugene Turk, and then, since 1998, by another accountant, Lawrence Milov. (IRS Ex. K, ¶ 7.)

The following table (*see* JPTO, IRS Ex. K, ¶¶ 6, 12) sets out Epstein's adjusted gross income for the years 1988 through 2002, as well as the dates Epstein filed his tax returns, the amount of federal tax liabilities for each of those years, the payments made by Epstein (if any), and the current amount due:

| Year | Date of Filing | Amount Due (In Return) | Adjusted Gross Income | Payments Made | Current Amount Due |
|------|------|------|------|------|------|
| 1988 | 9/11/91 | $13,885 | $53,300 | $0 | $25,492 |
| 1989 | 12/10/91 | $16,323 | $61,545 | $0 | $27,056 |
| 1990 | 12/10/91 | $24,095 | $84,689 | $1,500 | $31,682 |
| 1991 | 5/31/94 | $20,763 | $58,383 | $0 | $33,871 |
| 1992 | 5/13/94 | $32,256 | $91,724 | $0 | $46,707 |
| 1993 | 7/18/94 | $33,752 | $93,496 | $0 | $48,121 |
| 1994 | 5/1/98 | $35,530 | $98,350 | $8,500 | $52,231 |
| 1995 | Timely | $28,243 | $96,230 | $0 | $30,389 |
| 1996 | Timely | $19,974 | $69,353 | $0 | $21,492 |
| 1997 | 10/16/98 | $18,440 | $67,079 | $0 | $25,445 |
| 1998 | 5/19/00 | $27,414 | $94,369 | $0 | $39,971 |
| 1999 | 8/14/00 | $44,101 | $140,961 | $0 | $56,546 |
| 2000 | Timely | $36,770 | $121,221 | $600 | $39,138 |
| 2001 | Timely | $24,941 | $78,951 | $11,000 | $15,180 |
| 2002 | Timely | $44,613 | $142,346 | $0 | |

As the above table shows, with the exception of tax years 1995 and 1996 (following the filing of his first bankruptcy petition), and 2000–2002 (during the instant bankruptcy case), Epstein did not timely file his federal tax returns for the years 1988 through 2002. (IRS Ex. B2; K, ¶ 8; Tr. 20–21.) In fact, only two of the ten tax

returns for the tax years at issue in this case, 1988 through 1997, were timely filed. (Tr. 21–22; IRS Ex. K, ¶ 12.) From 1988 to 2001, Epstein paid a total of $21,600 on account of his federal tax liabilities for those years, in partial satisfaction of a federal tax debt of approximately $490,000 for those tax years. (IRS Ex. K, ¶ 12.)

## Discussion

*Pursuant to 11 U.S.C. § 523(a)(1)(C), Debtor's Assessed Federal Income Tax Liabilities for 1988 through 1997 Are Non–Dischargeable*

A discharge in bankruptcy does not discharge debtor of all debts. § 523(a)(1)(C) provides in relevant part:

*Section 523. Exceptions to Discharge*

(a) A discharge under §§ 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual Debtor from any debt

(1) for a tax or customs duty—

(C) with respect to which Debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax.

The two exceptions to dischargeability in § 523(a)(1)(C) are to be read in the disjunctive. *In re Tudisco*, 183 F.3d 133, 137 (2d Cir.1999); see also *In re Fernandez*, 112 B.R. 888, 891 (Bankr. N.D.Ohio 1990) ("Nondischargeability is not limited to finding a fraudulent return."). In order to prevail in a nondischargeability action under § 523(a)(1)(C), the IRS must prove that Debtor either made a fraudulent return or that he willfully attempted in any manner to evade or defeat payment of taxes. *In re Lilley*, 152 B.R. 715, 720 (Bankr.E.D.Pa.1993); *In re Griffith*, 161 B.R. 727 (Bankr.S.D.Fla. 1993.)

At issue in this adversary proceeding is whether the Debtor willfully attempted in any manner to evade or defeat payment of taxes for tax years 1988 through 1997. The Second Circuit has held that the "willfulness exception consists of a conduct element (an attempt to evade or defeat taxes) and a *mens rea* requirement (willfulness.)" *In re Tudisco*, 183 F.3d 133, 136 (2d Cir.1999). Although the Second Circuit declined in *Tudisco* to decide whether something more than non-payment of taxes is required to satisfy § 523(a)(1)(C)'s conduct requirement, the court joined the majority of other courts that have considered this issue in holding that a failure to pay accompanied by other conduct designed to evade or defeat taxes, is sufficient to establish nondischargeability under § 523(a)(1)(C). *In re Tudisco*, 183 F.3d at 137. In order words, failure to pay a known tax is, at a minimum, "relevant evidence which [a court] should consider in the totality of conduct to determine whether ... the debtor willfully attempted to evade or defeat taxes." *In re Fegeley*, 118 F.3d 979, 983 (3d Cir.1997) (quoting *Dalton v. Internal Revenue Service*, 77 F.3d 1297 at 1301 (10th Cir.1996)). Thus, nonpayment of tax coupled with concealment of assets or income, or a pattern of failure to file returns, is sufficient to establish conduct aimed at evading or defeating taxes. *See, e.g., In re Tudisco*, 183 F.3d 133 (2d Cir. 1999) (nonpayment of tax, failure to file returns and submission of false affidavit to employer intended to establish exemption from withholding); *In re Birkenstock*, 87 F.3d 947 (7th Cir.1996) (nonpayment of tax, failure to file, creation of shell trust); *Dalton v. Internal Revenue Service*, 77 F.3d 1297 (10th Cir.1996) (concealing assets and underestimating ownership interest in property on bankruptcy schedule).

The Second Circuit has interpreted "willfully" for purposes of § 523(a)(1)(C) to require that the debtor's

attempts to avoid his tax liability be undertaken "voluntarily, consciously, or knowingly, and intentionally." *In re Tudisco*, 183 F.3d at 137 (quoting *Dalton*, 77 F.3d at 1302). The burden of proof under § 523(a)(1)(C) is the ordinary civil standard; the IRS must show by a preponderance of the evidence that the claim should be excepted from discharge. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Langlois v. United States*, 155 B.R. 818, 820 (N.D.N.Y.1993). Because direct proof of intent is rarely found, courts look to circumstantial evidence to determine the debtor's intent. *In re Howard*, 167 B.R. 684, 687 (Bankr. M.D.Fla.1994). Such evidence may include evidence outside the tax years in question, "if sufficiently related in time and character to be probative." *In re Birkenstock*, 87 F.3d at 951 (quoting *United States v. Birkenstock*, 823 F.2d 1026, 1028 (7th Cir.1987)).

 In the case at bar, there is no dispute that Epstein knew he had a duty to pay income taxes for 1988 through 1997, and that he nevertheless failed to pay any but a small portion of his tax liability for those years, and failed to make almost all of his estimated quarterly tax payments.[2] Epstein testified that he understood his tax obligations and that an accountant prepared his returns and told him how much he was required to pay each quarter in estimated taxes. (Tr. 57, 59–60.) Nevertheless, for the tax years at issue (1988 through 1997), Epstein only made the following payments: (1) three separate $500 payments, totaling $1,500, made, respectively, on May 17, 1993, July 30, 1993 and August 13, 1993, in partial satisfaction of his 1990 tax liability of $24,095 (Tr. 23; IRS Ex. K, ¶ 12); and, (2)

one estimated tax payment of $7,500 on March 9, 1995 for the 1994 tax year, along with an additional payment of $1,000 with an extension request, on April 15, 1995 (Tr. 26; IRS Ex. K, ¶ 12), for a total payment of $8,500, in partial satisfaction of his 1994 tax liability of $35,530. In total, for the tax years 1988 through 2002, Epstein has made payment of approximately $21,600, a small fraction of his assessed federal income tax liabilities of more than $530,000. Although nonpayment of a known tax duty may not, alone, preclude the dischargeability of debtor's tax liabilities, pursuant to § 523(a)(1)(C), it certainly constitutes "relevant evidence which a court should consider in the totality of conduct to determine whether...the debtor willfully attempted to evade or defeat taxes." *In re Birkenstock*, 87 F.3d at 951–52 (internal quotes and citations omitted) (cited in *In re Tudisco*, 183 F.3d 133, 137 (2d Cir.1999)); see also *Fegeley*, at 983; *In re Dalton v. I.R.S.*, 77 F.3d 1297, 1301 (10th Cir.1996); *Haesloop v. United States of America (In re Haesloop)*, 2000 WL 1607316 (Bankr.E.D.N.Y.2000).

 Also relevant to consideration of the totality of Epstein's conduct to determine whether he willfully attempted to evade or defeat taxes is the fact that he did not timely file his tax returns for eight of the ten tax years at issue. (IRS Ex. K, ¶ 12.) In fact, of the eight late filed returns, five were filed more than 2 years late, and three were filed more than 1 year late. (*Id.*) This tactic of filing late returns delayed the IRS's recording and assessment of Epstein's tax liabilities, as well as the commencement of any collection process by the IRS against Epstein's assets, to the extent any assets were available for collection. (Tr. 21–23.) All the tax re-

---

**2.** Epstein made only one estimated tax payment (out of 40 estimated tax payments that came due during the period 1988 through

1997) in the amount of $7,500 on March 9, 1995, for the 1994 tax year. (IRS Ex. A1–A4.)

turns, however, were eventually filed, which had the effect of preserving Epstein's right to seek a discharge of his tax liabilities in bankruptcy, pursuant to § 523(a)(1)(B)(i).

It is also relevant to note that Epstein was earning, between 1988 and 2002, on average, approximately $90,000 each year, and his federal tax liability was, on average, approximately $35,862 each year for those years, but that Epstein only made one estimated tax payment of the 60 estimated tax payments due for those years and never fully paid his tax liability for any of those years. Epstein testified that he did not have sufficient money, at the end of every three months, to pay his estimated taxes because at the end of every three month period he had already spent all his money; and that, in addition, by the time he filed his tax returns each year, he had already spent all his money as well. (Tr. 102–103; IRS Ex. K, ¶ 13.) However, Epstein apparently was able to pay his obligations other than taxes. A review of Epstein's bankruptcy petition and schedules reveals that virtually all of the almost $500,000 of debts listed in Schedules E and F of Epstein's 2001 bankruptcy petition are owed to the United States for federal tax liabilities and only $6,000 is owed to other creditors. (IRS Ex. E.) Epstein conceded at trial that his primary reason for filing both the 1994 bankruptcy petition and the instant bankruptcy petition was to discharge his federal tax liabilities. (Tr. 81.) When asked at trial to explain why he did not have sufficient money for his tax liabilities, Epstein testified that he had "terribly mismanaged" his "personal finances":

> Q. Other than your tax debt, what else did you terribly mismanage?
>
> A. I mismanaged the whole picture. Otherwise, I would have had money for the taxes.
>
> Q. So you mismanaged because you paid for luxury items for you and your family that didn't allow you to pay your taxes?
>
> A. You say luxury items. You mean cars and things like that?
>
> Q. You made over $100,000 for many years. That's more than a lot of people make, and most people pay their taxes, but when it came to pay your taxes, every three months, you didn't have that money to pay?
>
> A. I did not have the money.
>
> Q. Was that because you spent it?
>
> A. Yes.
>
> Q. So you spent it on items whether you characterize it as luxury or not, you spent it on things to the extent you no longer could pay your taxes?
>
> A. Correct."

(Tr. 102–103.)

Consideration of the totality of Epstein's conduct leads to the conclusion that Epstein had the ability to meet his federal tax liabilities and made a conscious and deliberate decision to spend his money on nonessential items rather than pay those taxes. Epstein chose to take expensive vacations in Killington, Vermont, beginning in 1992, costing between $5,000 and $10,000 each year, to lease various cars for his personal use, as well as for his wife, including a luxury car, in the early 1990s, and to incur other nonessential expenses, including funding of private religious school for his son, from 1985 to 1990, at a cost of between $5,000 and $10,000 per year, leasing a car for his son, from the age of 17 to the age of 22, and paying for his son's college tuition at an out-of-state private college. (IRS Ex. K, ¶¶ 15–21.) Epstein also spent money on other nonessential expenses, including gym membership and the services of a personal trainer, beauty parlor appointments for his wife,

and various gifts to his wife and his son, within one year of the filing of the instant bankruptcy petition, amounting to, respectively, $10,500 to his wife, and $9,276 to his son. (IRS Ex. G2, pp. 6, 8; Tr. 74–75, 77.)

Attempting to justify his conduct, Epstein contends that he was faced with conflicting duties; *i.e.,* the duty to pay taxes and the duty to support his family, and should not be penalized for choosing the latter. (Tr. 100.) Similar arguments have been advanced by debtors in similar cases, and, in each of those cases, the debtors were found to have willfully evaded their taxes, pursuant to § 523(a)(1)(C), as a result of their deliberate choice to spend their income on discretionary expenses related to the support of their family, rather than on payment of their taxes. *In re Haesloop,* 2000 WL 1607316, 86 A.F.T.R.2d 2000–6380 (Bankr.E.D.N.Y. 2000) (discretionary expenses included payment of ex-wife's federal tax liabilities); *In re Wright,* 191 B.R. 291, 295 (S.D.N.Y. 1995) (discretionary expenses included paying private school tuition for children, credit card charges for wife and daughter, and financial support for brother and mother); *In re Griffieth,* 209 B.R. 823, 828 (Bankr.N.D.N.Y.1996) (holding that debtors owe no duty to supply children with nonessential luxuries such as private education, absent unusual circumstances). Epstein's decision not to use his income to satisfy his federal tax liabilities stems not from his inability to make the tax payments but rather from a conscious choice to use his income for other discretionary and nonessential expenses.

This conclusion that Epstein deliberately chose not to pay his taxes is reinforced by the fact that, even in years when Epstein managed to reduce his expenses or increase his income, he still paid virtually none of his tax obligations. Epstein testified that, following his first bankruptcy filing in 1994, he attempted to reduce his spending so that he would have more money to pay his taxes. (Tr. 81–82.) To this end (1) he moved from a house for which he was making a monthly mortgage payment of $3,700 to a house for which he made a monthly mortgage payment of $2,100 (Tr. 82); (2) he returned his Mercedes, leased at $700 per month, and instead leased an Infiniti at $469 per month (IRS Ex. K, ¶ 16; Tr. 82); and (3) he no longer hired a personal trainer, he reduced the number of times he went out to eat, and his wife reduced the times she went to the beauty parlor. (Tr. 83.) All of these changes resulted in a total savings of approximately $25,200 per year. (IRS's Post–Trial Proposed Findings of Fact and Conclusions of Law, p. 12). However, Epstein did not make any tax payments after 1994, and only made one payment, much later, in 2002, in partial satisfaction of his 2001 tax year liability. Furthermore, in 1999, Epstein earned approximately $96,000 more than in 1998, and further reduced his expenses by moving from an office in which he was paying rent of approximately $2,800 per month, to an office in which he was paying rent of $1,500 per month. (Tr. 84.) This resulted in savings of approximately $15,000 per year, in addition to his increased earnings in 1999; yet Epstein did not make any tax payments towards his 1998 tax liability or toward any previous tax year's liabilities. In 2002, although Epstein's adjusted gross income was $142,346, up from $78,951 in 2001, he only made a payment of $11,000, in partial satisfaction of a total 2001 tax liability of $24,941. (IRS Ex. K, ¶ 12.) Epstein attributed his failure to fully pay his 2001 tax liability to the fact that he had lost a few months of work in 2001 due to surgery he had undergone. (Tr. 93.) However, on cross-examination, the following exchange took place:

Q. You said part of the $150,000 that you earned this past year part of that went to payoff debts that you didn't pay in 2001?

A. Yes.

Q. What kind of things were those?

A. Just whatever I was behind in.

Q. What were you behind in?

A. Whatever it might be. Rent, utilities, stuff like that.

Q. Were you behind in the rent?

A. Yes.

Q. How behind in the rent were you?

A. I was behind let's say a month.

Q. So you paid an extra months rent in 2002 perhaps?

A. Yes.

Q. What else were you behind in?

A. I was always a month behind. Utilities, rent, phone, things like this I was trying to catch up on.

Q. This was specifically in 2001?

A. Yes.

Q. There is nothing say over $5,000 that you can think of that had not been paid?

A. No.

Q. So basically you were just one month behind?

A. Correct.

Q. So one month behind really doesn't account for that whole amount?

A. Correct.

Q. You're not sure where that money went?

A. No.

Q. It didn't go to the IRS?

A. Correct.

(Tr. 97–99.)

Epstein contends that he did not engage in any affirmative act designed to willfully evade or defeat the payment of his federal tax liabilities, and, pursuant to § 523(a)(1)(C), that the IRS must demonstrate that he did so. Contrary to Epstein's assertion, the record shows that Epstein has engaged in affirmative acts designed to defeat or evade his tax payments. First, Epstein showed a lack of candor by failing to list in his bankruptcy schedules an item of personal property which he believed had substantial value, and furthermore, by failing to list in his Statement of Financial Affairs various gifts of considerable value made to both his wife and son, within one year of filing his bankruptcy petition. On Schedule B, Epstein was required to list all personal property, including, in Category 4, "Household goods and furnishings, including audio, video and computer equipment." (IRS Ex. E.) Epstein did not include a piano in Schedule B, despite the fact that he testified that he believed the piano to be worth $25,000 at the time he filed his bankruptcy petition. (Tr. 68–70.) In addition, the Statement of Financial Affairs requires the debtor to disclose "gifts ... made within one year immediately preceding commencement of [the bankruptcy] except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member ...." (IRS Ex. E.) The Debtor failed to disclose gifts to his son, totaling approximately $9,276 and including payment of the lease and insurance for his son's car each month at a monthly cost of $523 (IRS Ex. G2, pp. 6–8), car repairs (IRS Ex. G2, p. 6), and other monetary gifts. (IRS Ex. G2, pp. 6–9; Tr. 75, 77.) He also failed to disclose gifts to his wife, totaling approximately $10,500. (IRS Ex. G2, pp. 6–9; Tr. 78–80.)

Second, Epstein attempted to thwart collection by the IRS by ensuring that none of his potentially valuable assets were placed in his name. From 1988 through the present, Epstein avoided ownership of the homes he lived in and the cars he and

his family drove through the mechanism of purchasing these assets in relatives' names, or leasing them. In the case of the various houses Epstein and his family lived in, Epstein either leased the houses, or Epstein's father-in-law, Mr. Katz, held the properties in his name, while Epstein and his family lived in the homes and used them as their own, and Epstein made substantially all the mortgage payments, ranging from $3,700 per month for the Morganville House to $2, 096 per month for their current home. (IRS Ex. K, ¶ 15; Tr. 65–67; IRS Ex. H2.) The record amply supports the inference that Mr. Katz held the houses in his name as an accommodation to his son-in-law, rather than as an investment, and that, besides paying the mortgage, Epstein acted in other respects as the owner of the Properties. Epstein testified that when he sought to reduce his expenses in 1995 after his 1994 bankruptcy, he moved to a rented house and instructed Mr. Katz to sell the Morganville house. Mr. Katz sold the Morganville house as his son-in-law instructed him to do, rather than retaining it as an investment property. (Tr. 66–67).

Epstein was also careful not to purchase any of the cars he or his wife drove in his own name, but rather leased the cars in his mother-in-law's name, despite the fact that, as with the homes Epstein and his family lived in, Epstein consistently made the lease payments on the cars. (IRS Ex. K, ¶ 16; Tr. 82.) As a result, Epstein's mother-in-law now owns the 1994 Infiniti Epstein drives, and for which Epstein completed the lease payments. (Tr. 61–63.) At trial, Epstein testified that neither he nor his wife could obtain a mortgage or lease a car in their own names because of their "credit rating." (Tr. 101–102.) However, Epstein did not produce one document in support of this assertion (such as a credit report), nor did he explain why, if even if this were true, he did not pur-

chase homes or cars with his in-laws as guarantors or co-obligors, since he consistently made the mortgage and lease payments.

Epstein also argues that the IRS's collection activity with regard to his assets was "non-existent". (Debtor's Post–Trial Memo, pp. 6–7; Tr. 47.) It is unclear why this Debtor thinks this is significant; there is no requirement that the taxing authorities show that they attempted to seize the Debtor's assets as a prerequisite to objecting to the dischargeability of tax debt. Moreover, as the IRS pointed out at trial, Epstein effectively precluded the IRS from pursuing any collection activity with regard to his assets, as he had avoided ownership of any assets which the IRS could levy upon. (Tr. 47–48.) It would turn the law on its head to permit Epstein to use the fact that he successfully stymied collection efforts by the IRS as a basis for obtaining a discharge of his taxes. *In re Haesloop v. United States,* 2000 WL 1607316, at *6 (Bankr.E.D.N.Y.2000) (debtor's attempt to avoid accumulating assets in his own name that could be seized to satisfy his liabilities was a factor in determining, under the totality of circumstances, whether debtor had attempted to willfully evade or defeat his taxes, pursuant to § 523(a)(1)(C)); *In re Dalton,* 77 F.3d 1297 (debtor's concealment of assets and deliberate underestimation of ownership interest in property on bankruptcy schedules were held to be sufficient to preclude discharge of debtor's tax liabilities, pursuant to § 523(a)(1)(C)).

Section 523(a)(1)(C) renders nondischargeable attempts in any manner to evade or defeat a tax. The totality of Epstein's conduct leads to the conclusion that he engaged in a scheme of willful evasion and conduct intended to defeat the payment of his full tax liability.

*Conclusion*

Epstein willfully attempted to evade or defeat his tax liabilities for the 1988 through 1997 tax years, pursuant to § 523(a)(1)(C) of the U.S. Bankruptcy Code. Therefore, the federal income taxes assessed against Epstein for tax years 1988–1997 are nondischargeable.

IT IS SO ORDERED.

The IRS is directed to settle an appropriate judgment.