**In re Gary G. & Josefina V. GRIFFIETH, Debtors.**

**Bankruptcy No. 94–14714.**

United States Bankruptcy Court, N.D. New York.

May 17, 1996.

Chapter 7 debtors' stated intent to reaffirm their other personal debts, except for their self–created debt to the Internal Revenue Service (IRS), was further indicia of debtors' lack of good faith, of kind that might warrant dismissal of bankruptcy case for "cause." Bankr.Code, 11 U.S.C.A. § 707(a).

---

Cooper, Erving, Savage, Nolan & Heller, Albany, NY (Justin A. Heller, of Counsel), for debtors.

United States Trustee, Albany, NY; Kevin Purcell, of Counsel.

## MEMORANDUM DECISION AND ORDER

ROBERT E. LITTLEFIELD, Jr., Bankruptcy Judge.

This contested matter is before the court by virtue of a motion by United States Trustee ("UST") pursuant to Bankruptcy Code § 707(a) (11 U.S.C. §§ 101–1330 hereinafter the "Code") seeking dismissal of the voluntary Chapter 7 bankruptcy case filed by Gary G. Griffieth and Josefina V. Griffieth ("Debtors"). This matter is within the court's core jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(A), (O).

### Facts

On December 29, 1994 Gary G. Griffieth and Josefina V. Griffieth ("Debtors") filed their voluntary joint petition seeking relief under Chapter 7 of the Bankruptcy Code ("petition date"). The Debtors' instant case was precipitated primarily by their obligation to the Internal Revenue Service ("IRS") in the amount, of approximately $543,728.

The Debtors' present obligation to the IRS is the result of their accrual of unpaid income taxes beginning in 1982 when they resided in California. Debtors were then medical doctors with sole proprietorships; Mr. Griffieth worked as an independent contractor and Mrs. Griffieth worked for herself. When the Debtors' accountant (Joseph West, C.P.A.) compiled their 1982 tax returns he realized that they had underestimated their tax liability in the amount of approximately $30,000.00 for the 1982 tax year.

Mrs. Griffieth operated her medical practice from 1982 through 1984. Her office closed when the hospital she was associated with removed her from the staff. Ironically, in 1983 Debtors again had failed to properly withhold money for their taxes which resulted in an additional tax liability in the amount of $52,612.00. In 1984, the Debtors incurred another $21,620.00 in unpaid taxes.

The Debtors satisfied their 1985 tax liability. At this time Mrs. Griffieth was working for a hospital as an independent contractor and Mr. Griffieth had opened his own medical practice. In 1986 the Debtors again failed to pay their entire tax liability and added $39,562.00 to their then-outstanding

unpaid balance to the IRS in the amount of $104,232.00. In 1987, the IRS audited Mrs. Griffieth's terminated sole proprietorship, Josefina Griffieth, M.D. As a result of poor record keeping on Mrs. Griffieth's part, the IRS disallowed all of the business expenses and levied them with a $304,000.00 tax liability.

In 1987, 1988, 1990, 1991, and 1992 the Debtors did not fully pay their taxes. Debtors incurred tax deficiencies in the respective amounts of $44,4993.00, $22,645.00, $40,-944.00, $9,348.00, and $30,874.00 for those years. These amounts do not account for interest and penalties on the prior unpaid taxes.

The IRS garnished Mrs. Griffieth's wages beginning in either late 1989 or early 1990. The IRS withheld $1,200.00 per pay check which then increased to $2,000.00. Garnishment continued for two years and then abruptly terminated when Mrs. Griffieth's employment status changed from a part-time to full-time employee at the county hospital. Although the Debtors were unaware of any reason why the garnishment should discontinue, neither the Debtors nor the county hospital reinstated the garnishment.

In June 1993 the IRS engaged the Debtors to pay $10,000.00 a month on an installment basis. The Debtors' discontinued making the monthly payments after February 1994. According to the Debtors, they were to renew the installment obligation and continue making payments. See Transcript of Debtors' August 4, 1995 deposition ("*T.*") at 34–36. However, the Debtors did not renew, based upon the their claim that Mr.Griffieth's medical practice was experiencing financial losses. Subsequently, Debtors made a feeble effort to pay their overdue taxes by paying the IRS $1,000 per month. Debtors also discontinued this payment prior to leaving California.

In August 1994 Mr. Griffieth closed his medical practice and the Debtors moved to New York. The Debtors began working in New York State as physician-employees in September 1994. Currently, both of the Debtors are employees and their taxes are properly withheld by their employer. In December 1994 Debtors filed their instant joint Chapter 7 petition in which they disclose, *inter alia,* after-tax income in the amount of $14,168 per month. In their Statement of Intention filed with their petition, Debtors declare their intent to reaffirm their obligations secured by their California real property (encumbered by a mortgage securing a debt in the amount of $210,000) and two automobiles (for which they pay $900 per month).[1] Debtors disclose discretionary income (net of all expenses) in the amount of $4,363 per month. In their Schedule "J" filed with their petition, Debtors disclose total monthly expenses in the amount of $9,805. Their monthly expenses include, but are not limited to, various forms of insurance ($1,895), clothing ($750), telephone ($200), tithing to their church ($2,100) and private school tuition for Debtors' two children ($1,910).

As a consequence of their intention to reaffirm all of their secured debt (California house and automobiles) Debtors therefore seek to discharge their unsecured debt, 95% of which is comprised of the IRS debt.

The UST moved by motion dated August 31, 1995 to dismiss Debtors' case pursuant to Code § 707(a). Debtors oppose the motion and the parties were provided with an opportunity to submit memoranda.

## DISCUSSION

■ The UST has moved to dismiss the Debtors' case for "cause" pursuant to Code § 707(a).

■ Under Code § 707(a) the bankruptcy court may exercise its discretion to dismiss a case. Discretionary dismissal recognizes that there is no constitutional right to a bankruptcy discharge. See *United States v. Kras,* 409 U.S. 434, 447–47, 93 S.Ct. 631, 638–39, 34 L.Ed.2d 626 (1973). The statute permits dismissal "for cause, including" a debtor's "delay ... prejudicial to creditors" (Code § 707(a)(1)), "nonpayment of [statutory] fees" (Code § 707(a)(2)) or failure to

---

1. In their deposition, Debtors made clear their intention to repay only their non-IRS debt. When asked why they elected not to repay some of their debt, Mr. Griffieth's response was that "it

[sic] was never any intention not to pay back" what they owed personally and what was owed on Mr. Griffieth's California medical office. T. at 42.

timely file certain information (Code § 707(a)(3)). Moreover, the examples of cause set forth in the statute are "merely illustrative and are not an exhaustive listing." *In re Davidoff,* 185 B.R. 631, 634 (Bankr. S.D.Fl.1995); *Industrial Insurance Services, Inc. v. Zick (In re Zick),* 931 F.2d 1124, 1126 (6th Cir.1991). *See also* Code § 102(3) (the term "including" is not limiting).

▮ The absence of a debtor's "good faith" has been generally recognized as a valid "cause" for dismissal under Code § 707(a). *Zick,* 931 F.2d at 1126–27; *Davidoff,* 185 B.R. at 634; *In re Cappuccetti,* 172 B.R. 37 (Bankr.E.D.Ark.1994); *In re Cecil,* 71 B.R. 730 (Bankr.W.D.Va.1987); *In re Studdard, M.D.,* 159 B.R. 852 (E.D.Ar.1993); *In re Hammonds,* 139 B.R. 535 (Bankr. D.Colo.1992); *In re Brown,* 88 B.R. 280, 281, (Bankr.D.Hawai'i 1988). A determination regarding a debtor's "bad faith" is *sui generis.* Courts have developed multiple factors which are viewed together on an *ad hoc* basis (*Brown,* 88 B.R. at 284) as a totality of circumstances. See e.g., *Zick,* 931 F.2d at 1129; *Davidoff,* 185 B.R. at 634; *Cappuccetti,* 172 B.R. at 39; *Studdard,* 159 B.R. at 856; *Brown,* 88 B.R. at 281.

▮ Clearly, while the "facts required to mandate dismissal based upon a lack of good faith are as varied as the number of cases" (*In re Bingham,* 68 B.R. 933, 935 (Bankr. M.D.Pa.1987)), some common factors emerge from the case law. These factors include: (1) debtor's manipulations having the effect of frustrating one particular creditor, (2) absence of an attempt to pay creditors, (3) debtor's failure to make significant lifestyle changes, (4) debtor has sufficient resources to pay substantial portion of debts, (5) debtor inflates expenses to disguise financial well-being, and (6) debtor is overutilizing protections of the Code to the unconscionable detriment of creditors.

### Debtors' Lifestyle

The Debtors disclose after-tax income in the amount of $14,168.48 per month. By way of contrast, in 1995 the average income for a family in the United States was $17,000.00 per *year.* See *Davidoff,* 185 B.R. at 636. The Debtors receive almost as much *net* income per month as other families realize in

a year. While Debtors own real property in California, as of the petition date they rented residential premises located in a suburb of Albany, New York. Their monthly expenses include payments on two automobiles and private school tuition for their children. Debtors' Statement of Intentions filed with their petition indicates that they intend to reaffirm their obligations on their California property and automobiles. In their deposition they testified that they also intended to reaffirm their credit card obligations. T. at 43. According to the Debtors, they have monthly expenses totaling $9,805 resulting in discretionary income in the amount of $4,363 per month. Debtors are enjoying a relatively comfortable lifestyle, and are apparently unwilling to undertake any "belt-tightening" However, refusal to alter one's lifestyle, and pay one's creditors is a factor in the "bad faith" analysis under Code § 707(a). See *Davidoff,* 185 B.R. at 636; *Studdard,* 159 B.R. at 856; *Brown,* 88 B.R. at 283.

### Inflated Expenses

The UST argues that the following monthly expenses claimed by Debtors are inflated and objectionable:

$2,100.00 in tithes,

$1,910.00 in private school tuition,

$750.00 in clothing expenses,

$199.00 renters insurance,

$350.00 life insurance,

$450 health insurance, and

$790.00 disability insurance.

For the reasons that follow, the Court agrees that the propriety of Debtors' expenses would not appear to withstand scrutiny. As a result, Debtors may be financially able to generate approximately an additional $4,000 per month in discretionary income available to pay their creditors.

### Tithes

Debtors' claim that "it is an obligation by our faith" for them to tithe ten percent of their gross earnings or $2,100 per month. T. at 47. On that basis they have listed this as a monthly living expense on their Schedule "J".

■ Although it has not been raised by Debtors, it is noted at the outset that "the giving of charitable contributions is not a right protected by the free exercise clause of the First Amendment." *In re Faulkner*, 165 B.R. 644, 647 (Bankr.W.D.Mo.1994) citing *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) and *Church of Lukumi Babalu Aye. Inc. v. Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). .

In *In re Cavanaugh*, 175 B.R. 369, 374, (Bankr.D.Idaho 1994) the issue of the propriety of a debtor's tithing was resolved as a question of reasonableness. The court viewed tithing as "discretionary" rather than as being necessary for the debtor's support. It reasoned that "the debtors should not be denied the right to make donations purely because of the discretionary nature of these items.... However, by the same token the debtors have no right to more discretionary income than other debtors merely because they wish to use some of it to make charitable contributions." *Id.* at 374–75. Courts have held debtor's tithing of 10% of their income to be excessive in cases where the monthly amount was considerably less. See e.g., *Faulkner*, 165 B.R. at 649 (10% or $300 per month constituted abuse of Code); *In re Lee*, 162 B.R. 31 (Bankr.N.D.Ga.1993) ($350 per month unreasonable under circumstances); *In re Sturgeon*, 51 B.R. 82, 83 (Bankr.S.D.In.1985) (10% or $140 per month found improper "expense").

Accordingly, it would appear that in a reorganization case, a substantial portion of the Debtors' claimed $2,100 monthly tithing would be required to fund repayment of their creditors. Assuming *arguendo*, that a reasonable monthly tithing under the present circumstances would be $500 (still considerably more than the cases cited above), the prospective monthly amount available for the payment of creditors would increase by $1,600 monthly or $19,200 annually.

2. Nothing in the record suggests that Debtors' children have disabilities or other special needs requiring private instruction.

3. While the Debtors have not made clear whether their life insurance is term or whole life, to the

### Private School Tuition

■ Debtors have enrolled their children in a private school in Albany, New York. Under the instant circumstances, Debtors' monthly expense in the amount of $1,910 ($22,920 annually) is unwarranted.[2] Generally, parents "owe no duty to their children to provide them with nonessential luxuries while the debtors' unsecured creditors receive no payment on their just claims." *Studdard*, 159 B.R. at 854. Accordingly, absent some justification that Debtors' children would not be adequately served by the public school system, Debtors' annual expense of $22,920 for private school tuition is unreasonable. Assuming, *arguendo*, that 50% of Debtors' expenditure were devoted to payment of their creditors, their debt could be satisfied by approximately an additional $12,000 annually.

### Other Inflated Expenses .

Debtors' clothing, laundry and dry cleaning, renters insurance, life insurance, telephone and transportation expenses are excessive. In *In re Smith*, 157 B.R. 348, 351 (Bankr.N.D.Ohio 1993) the court examined the debtor's claimed expenses and found the following monthly expenses "unduly high": telephone ($100.00), transportation ($215.00) and car payment ($265.00). Similarly, in *In re Grant*, 51 B.R. 385, 395 (Bankr.N.D.Ohio 1985) the debtors were married with two children. The court found the following monthly living expenses excessive: telephone ($220.00), food ($700.00), transportation ($400.00) and car payment ($490.01), recreation ($450.00) and clothing ($550.00). In light of the foregoing, Debtors' claimed monthly expenses for telephone ($200), transportation ($160), car payments ($900), and clothing ($750) appear to be excessive by approximately $1000 per month ($12,000 annually) in the aggregate.

■ Debtors' monthly expense for life insurance in the amount of $350 also appears excessive.[3] In *In re Vianese*, 192 B.R. 61

extent that their monthly payments are attributable to a savings or investment component of the insurance, such would be an improper use of their discretionary income.

(Bankr.N.D.N.Y.1996) the court found the debtors' monthly expenditure of $250 for life insurance to be excessive. *Id.* at 72 citing *In re Smith,* 187 B.R. 678 (Bankr.D.Idaho 1995). Assuming a more reasonable monthly premium of $100, Debtors would have an additional $250 per month ($3000 annually) available to pay creditors.

Debtors' claimed expense in the amount of $199 per month for renter's insurance appears overstated. In *Studdard,* as in the instant case, the value of the debtor's personal property being insured was approximately $37,000.00 which the debtors paid $12.50 per month to insure. Thus it is likely that Debtors have either overstated or grossly overpay their renter's insurance by over 90%.

 Lastly, the Debtors' claimed expense for disability insurance, in the amount of $790 per month ($9,480 annually), falls substantially beyond the boundary of reasonableness for a Debtor seeking a discharge of indebtedness. While professionals may prudently purchase extra disability insurance, the magnitude of this expenditure is unjustified. Per the Debtors' bankruptcy petition they are full-time employees. T. at 18–19. As such, they should be covered under their employer's disability insurance policies. In addition, New York State provides supplemental income for the debtors who become disabled. There is no longer a need for this extravagant amount of disability insurance as there was when Debtors were self-employed. Accordingly, most of the amount spent on disability insurance could go to repay creditors.

As discussed above, Debtors' claimed expenses indicate either that they enjoy a relatively high standard of living or that they have misrepresented their expenses to make it appear that they have less discretionary income available to pay their creditors. In either event, it appears that a more reliable figure which the Debtors may have available to pay their creditors would be closer to between $9,000 and $10,000 per month— more than twice than their claimed discretionary income in the amount of $4,363.

---

4. The court's calculations indicate that the IRS debt represents approximately 67% of their total debt.

## Discharge of Principally One Creditor

For the most part Debtors are seeking the discharge of a single obligation to the Internal Revenue Service in the amount of approximately $543,728. Courts have held that seeking to discharge primarily one creditor is an element of bad faith under Code § 707(a). See e.g., *In re Cappuccetti,* 172 B.R. at 40. (tax debt was 90% of total debt; other debts reaffirmed); *In re Davidoff,* 185 B.R. at 635 (Chapter 7 filed immediately before hearing to show cause why secured creditor not entitled to repossession of collateral); *In re Brown,* 88 B.R. at 283 (debtor had one principal creditor which he sought to discharge).

Debtors carefully argue that their IRS debt represents only 62% of the total debt.[4] However, their argument is somewhat misleading. The Debtors seek a discharge of all nonpriority unsecured debt. Of the total nonpriority unsecured debt to be discharged, over 90% is owed to the Internal Revenue Service. The Debtors' have "reaffirmed our personal debts [including the California] house and [credit] cards." T. at 43; Statement of Intentions. The balance of Debtors' total debt is comprised of secured reaffirmed debt, nondischargeable debt (student loans) and unsecured priority debt. Clearly, therefore, the purpose of the Debtors' instant case is to discharge primarily their IRS debt.

## No Good Faith Attempt to Pay Creditors

 Debtors abandonment of their attempt to repay their IRS obligation casts substantial doubt on their good faith. See *In re Cappuccetti,* 172 B.R. at 40; *Brown,* 88 B.R. at 283. Debtors failed to adequately negotiate with the IRS in an attempt to establish an offer in compromise. Instead the Debtors filed their Chapter 7 case when they decided that payment of their prepetition IRS obligation would require unwelcome belt-tightening.

While in California (during June 1993), the Debtors entered into an agreement with the IRS wherein they stayed current by paying $10,000 per month. According to Mr. Griffieth, they ceased payments to the IRS about

8 months later in February 1994 due to the failure of his medical practice in California. Mr. Griffieth testified that Debtors made a payment offer to the IRS based upon their "reasonable assessment of what our expenses are." T. at 42. The IRS responded with a counter-offer which Debtors rejected.[5] Debtors moved to New York State during August 1994, obtained employment and filed their present voluntary Chapter 7 petitions during December 1994 seeking a discharge of the IRS debt.

In view of this court's consideration of the various monthly living expenses claimed by Debtors, it is not surprising that the IRS counter-offered that the Debtors pay $7500 per month toward back taxes. The question is one of the Debtors' good faith in refusing to compromise their lifestyle, rejecting the counter-offer and seeking discharge of the IRS debt. Once in New York, the Debtors were no longer saddled with the ongoing business losses and overhead generated by Mr. Griffieth's California medical practice. Debtors' income has increased and exposure to business loss has been eliminated. With this marked improvement in Debtors' financial picture, their reliance upon "reasonable" expenses as the basis for rejecting the IRS's $7500 per month repayment offer is without merit. In light of their improved financial condition, the Debtors should have renewed their negotiations with the IRS. See *In re Peluso,* 72 B.R. 732, 737 (Bankr.N.D.N.Y. 1987) (debtors should make reasonable effort to fulfill obligations prior to seeking discharge of obligations).

In view of the foregoing, the court cannot conclude that Debtors made a good faith effort to repay the IRS debt as an alternative to seeking discharge under Chapter 7.

**Debtors Inaction Over a Period of Years Renders Their Tax Liability Self–Created**

Debtors generated an unpaid tax liability in excess of $30,000.00 for the 1982 tax year.

T. at 6. In 1983 Debtors retained the same accountant who underestimated their 1982 tax liability to perform the accounting for Mrs. Griffieth's private medical practice. Without taking any additional precautions or assuring themselves of compliance with the Internal Revenue Code the Debtors carried on business as usual. T. at 8. Consequently, the Debtor incurred another $52,612.00 of tax liability for the 1983 tax year. For the tax year 1986 the Debtors incurred an additional $39,562.00 tax deficiency. See *Griffieth Debt Classification,* Debtors' Brief in Opposition to Motion to Dismiss. In 1987 Mrs. Griffieth's earlier private practice was audited and because of the discrepancies and defects in the business's books the Debtors owed the IRS an additional tax liability for the 1984 tax year. *Id.* However, the extent of Debtors' willful ignorance of their duties as taxpayers does not end here.

Repeatedly in 1987, 1988, 1990, 1991, and 1992 the Debtors incurred additional tax liabilities of $44,499.00, $22,645.00, $40,944.00, $9,349.00 and $30,874.00 respectively. Each year they incurred a new liability for failing to pay the current year's taxes. Thus, Debtors' IRS debt did not arise overnight, but rather, is the product of little or no action by the Debtors over a number of years. During this period, both Debtors were receiving income (thereby incurring income taxes) and were therefore presumably able to make payments on their taxes. Their failure to make adequate arrangements for withholding funds over this period and their failure to satisfy such taxes over this period casts a light upon the Debtors' situation which makes it appear like more of a self-created liability than a uncontrollable financial misfortune.

**Conclusion**

While the "fresh start" policy underlying Chapter 7 is well recognized, "the Act limits

---

5. The relevant portion of the transcript of Debtors' August 4, 1995 deposition is the following testimony of Mr. Griffieth:

We met with the IRS and gave him what I felt to be a reasonable assessment of what our expenses are and my desire to pay back the IRS. And the numbers that he arrived at that he felt we should pay was $7500 a month and there was no way we could do it. And he said

he wouldn't listen to anything under that. And that if we did enter into an Offer and Compromise agreement, it would run no longer that a year. So, we are talking about staying current with taxes, and paying $7500 a month and do all that in a year was frankly impossible for us to do. He put us in a completely impossible situation.

T. at 42.

the opportunity for a completely unencumbered new beginning to the 'honest but *unfortunate* debtor.'" *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934) (emphasis added). As physicians, the Debtors are well-educated and relatively sophisticated. From 1982—when the unpaid IRS debt began to accrue—Debtors were aware of the importance of adequate record keeping and income withholdings. However, they failed for an extended period of years to undertake the fundamental burden of all taxpayers, to wit, to maintain adequate records and properly withhold money for (or make other arrangements to pay) income taxes. For more than 10 years Debtors incurred unpaid income tax liability to the IRS presently totaling approximately $543,728. The Debtors here are not "unfortunate" in the sense intended by Congress (see *id.*) unless liability on federal income taxes qualifies one as unfortunate. This court is not prepared to make that finding. Taxes are one of the few events in life that are said to be "certain." Moreover, the Debtors' failure to effectively attend to their unpaid IRS taxes over a period of years, viewed in the context of their relatively high level of sophistication, makes their present indebtedness to the IRS appear more self-created through wilful ignorance than the result of unforeseen events outside Debtors' control.

■ Debtors are also not "unfortunate" with respect to their actual ability to repay a substantial portion of their creditors. According to their schedules "I" and "J", the instant Debtors enjoy net *discretionary* income in the amount of $52,356 annually.[6] This is substantially more than most Chapter 7 debtors' households receive in gross income annually. Thus without disturbing Debtors' relatively elevated lifestyle, they could fund approximately $260,000 into a repayment plan over a sixty month period. Since the IRS debt comprises more than 90% of the total debt which Debtors seek to discharge, they could repay approximately one-half of the IRS debt while maintaining their lifestyle. Courts have held that a debtor's ability to substantially pay his debts is a factor indicating that a Chapter 7 case was filed in bad faith. See *Davidoff,* 185 B.R. at 631; *Cappuccetti,* 172 B.R. at 39.

■ The Debtors' claimed monthly expenses which will not be fully reiterated here (see Schedule "J" filed with their petition) indicate that they enjoy a relatively upscale, expansive lifestyle. As discussed at length above, the Debtors may well be able to undergo considerable "belt-tightening" which would result in additional funds in the amount of approximately $5,000 per month which would be available to pay creditors.[7] The Debtors' decision to discharge their debt rather than make any adjustments in their expansive lifestyle is further evidence of bad faith. See *Zick,* 931 F.2d at 1129; *Davidoff,* 185 B.R. at 631; *Cappuccetti,* 172 B.R. at 39.

■ The primary purpose of the Debtors' instant case is to avoid their single debt owed to the IRS. *Id.* The Debtors' stated intent to reaffirm their other personal debts, viewed together with the self-created nature of Debtors' present IRS debt, constitutes further indicia of an absence of Debtors' good faith.

In the court's view the above circumstances, when viewed in their totality, indicate that the Debtors' case was not filed in good faith, thereby constituting "cause" justifying dismissal of their case pursuant to Code § 707(a). Accordingly, based upon the foregoing reasons, it is hereby

**ORDERED,** that the Debtors herein Chapter 7 case is dismissed for "cause" pursuant to Code § 707(a).

---

6. Debtors' monthly income, net of all claimed expenses, multiplied times 12 months ($4,363 × 12 = $52,356).

7. The additional funds of approximately $4,000 per month would result in $240,000 over a period of 60 months. If this is added to the Debtors' claimed discretionary income ($4,363 monthly) the total amount which could be funded into a repayment plan over a 60 month period would be approximately $500,000.