**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**No. 17-1197**

---

RALPH JANVEY,

       Creditor - Appellant,

v.

PETER ROMERO,

       Debtor - Appellee.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Senior District Judge. (1:16-cv-03355-JFM)

---

Argued: December 6, 2017               Decided: February 21, 2018

---

Before GREGORY, Chief Judge, and WILKINSON and HARRIS, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Gregory and Judge Harris joined.

---

**ARGUED:** Kevin Marshall Sadler, BAKER BOTTS L.L.P., Palo Alto, California, for Appellant. Kevin Gerald Hroblak, WHITEFORD TAYLOR & PRESTON, L.L.P., Baltimore, Maryland, for Appellee. **ON BRIEF:** Scott D. Powers, Stephanie F. Cagniart, BAKER BOTTS L.L.P., Austin, Texas, for Appellant.

---

WILKINSON, Circuit Judge:

Appellee Peter Romero filed a Chapter 7 bankruptcy petition after he was found liable for $1.275 million to the victims of a multibillion-dollar Ponzi scheme. Appellant Ralph Janvey, the receiver in the Ponzi scheme litigation, moved to dismiss Romero's bankruptcy petition for cause under 11 U.S.C. § 707(a). The bankruptcy court denied the motion, and the district court affirmed the bankruptcy court's order. We focus only on the matter before us—that is, whether Romero's decision to file for bankruptcy rises to the level of bad faith and therefore constitutes cause for dismissal under § 707(a). Because the bankruptcy court did not abuse its discretion in denying Janvey's motion to dismiss, we affirm.

I.

A.

We begin with the facts of the underlying litigation, which hover above and around the present action but do not strictly pertain to the question before us. They are, to borrow a term from film, the McGuffin in this case.[1]

Peter Romero had a storied career in the Foreign Service. He served for twenty-four years with the State Department, most prominently as an Ambassador and as Assistant Secretary of State for Western Hemisphere Affairs. Upon retiring from the

---

[1] *See* 3 *Oxford English Dictionary Additions Series* 285 (John Simpson & Michael Proffitt eds., 1997) (defining "McGuffin" as "a particular event, object, factor, etc., which assumes great significance to the characters and acts as the impetus for the sequence of events depicted, although often proving tangential to the plot as it develops").

Foreign Service, Romero founded a private consulting company to advise companies that do business overseas. One of his clients was the Stanford Financial Group (Stanford). Romero consulted for Stanford for approximately seven years. He earned a total of $700,000 in fees plus reimbursements for travel expenses and returns on his own Stanford investments. While Romero was working for Stanford, the company was being used to carry out a multibillion-dollar Ponzi scheme. The scheme was unearthed in 2009, at which point Romero cut ties with Stanford.

The Securities and Exchange Commission sued Stanford, its affiliated entities, and its leadership in the Northern District of Texas. That court appointed Ralph Janvey to be the receiver in the litigation. Pursuant to his duties as receiver, Janvey sued Romero to recover for victims of the scheme the payments Romero had received while consulting for Stanford. Romero participated in mediation and offered to settle with Janvey. But mediation proved unsuccessful, and Janvey rejected the settlement offer without proposing a counteroffer. Romero ultimately lost at trial, and Janvey was awarded approximately $1.275 million in damages, interest, and fees. Romero appealed the judgment to the Fifth Circuit with no success. *See Janvey v. Romero*, 817 F.3d 184 (5th Cir. 2016). While the appeal was pending, he again offered to settle with Janvey, who again rejected the offer without a counteroffer. Janvey instead moved for leave to register the judgment in California under 28 U.S.C. § 1963 on the belief that Romero had property there. The district court granted the motion.

B.

3

And so we arrive at the present bankruptcy action. Romero voluntarily filed a Chapter 7 bankruptcy petition in the District of Maryland the day after the judgment against him was certified in California. At the time, Romero's financial situation was as follows:

*Assets*: Romero's assets totaled more than $5.348 million. The majority of these assets, however, were statutorily exempt. Nobody challenged these claimed exemptions. Among Romero's exempt assets were three real properties he owned with his wife as tenants by the entirety, one of which was their home and the others of which were rental properties. Romero also claimed as exempt pension, retirement, and benefit plans. Romero's nonexempt assets included one car and two boats, which he turned over to the Chapter 7 trustee for administration. The trustee sold both the car and one of the boats, and Romero agreed to pay the docking and insurance fees for the other boat until it was sold.[2]

*Unsecured Debts*: Janvey's judgment accounted for roughly 90% of Romero's unsecured debt when he filed for bankruptcy. The remainder was composed of debts with two law firms for unpaid legal fees totaling approximately $150,000.[3]

*Expenses*: Most prominent among Romero's expenses were his wife's medical costs, which averaged $12,000 per month. Romero's wife had contracted a bacterial brain

_____

[2] The remaining boat sold after Janvey moved to dismiss Romero's petition.

[3] Romero initially listed three unpaid credit card debts among his unsecured debts. Those cards, however, were primarily in his wife's name, and Romero later amended his petition to reflect that all three debts had been paid.

infection in 2013 that left her incapacitated and in need of extensive care. Until recently, the majority of Romero's wife's medical expenses were covered by her three disability policies and Romero employed a live-in caretaker. After Romero filed for bankruptcy, however, two of his wife's three disability policies were terminated; meanwhile, her condition slightly improved and Romero was able to scale back to daily care. Romero also listed entertainment expenses of $1,000 per month, most of which went to the docking and other costs for the boat he had turned over to the trustee.

*Income*: Romero reported monthly income approximately $350 less than his monthly expenses. Romero and his wife were both unemployed—she because of her illness and he because he had been unable to find work after the Stanford scheme was discovered. Their combined monthly income came entirely from Romero's State Department pension plan, their two rental properties, social security, and long-term disability.

More than six months after Romero filed for bankruptcy, Janvey moved to dismiss his petition under 11 U.S.C. § 707(a) on the ground that Romero had abused the bankruptcy process to avoid Janvey's judgment. The bankruptcy court denied the motion. *See In re Romero*, 557 B.R. 875 (Bankr. D. Md. 2016). It acknowledged that bad faith can constitute cause for dismissal under § 707(a), but it found that Romero had not acted in bad faith. In doing so, it applied the eleven bad-faith factors set forth in *McDow v. Smith*, 295 B.R. 69 (Bankr. E.D. Va. 2003). The bankruptcy court acknowledged that Romero's "primary motivation in filing the petition was to address [Janvey]'s judgment" but that he also "faced the inability to earn a living, his wife's illness and care needs, the

5

pending termination of two disability policies, and aggressive and costly litigation tactics by [Janvey]." *Romero*, 557 B.R. at 883-84. The court also noted that Romero had twice tried and failed to settle the matter in the course of the underlying litigation. *Id.* at 884. It observed that most of Romero's assets were statutorily exempt and that he "lives a comfortable, but not exorbitant, lifestyle. Perhaps his primary discretionary expense is eating out at restaurants. He belongs to no country clubs or social clubs." *Id.* at 883. The court accordingly denied Janvey's motion to dismiss and ultimately granted Romero a discharge under 11 U.S.C. § 727.

Janvey appealed the denial of his motion to dismiss and—by inference, at least— the eventual discharge of Romero's debt to the district court, which affirmed the order of the bankruptcy court. He now appeals to this court. We, like the district court, review the bankruptcy court's denial of a motion to dismiss for abuse of discretion, its factual findings for clear error, and its legal conclusions de novo. *See In re Jenkins*, 784 F.3d 230, 234 (4th Cir. 2015); *In re Piazza*, 719 F.3d 1253, 1271 (11th Cir. 2013). Janvey's claims boil down to an accusation that Romero has abused the bankruptcy process and should therefore be ineligible for its protections. For the reasons that follow, we do not agree.

## II.

A bit of background may be helpful in understanding the operation of the relevant statutes. The Bankruptcy Code balances the interests of both creditors and debtors in the distribution of an insolvent party's assets. The purpose of the Code is therefore twofold: "to convert the estate of the bankrupt into cash and distribute it among creditors and then

6

to give the bankrupt a fresh start." *Kokoszka v. Belford*, 417 U.S. 642, 645-46 (1974) (quoting *Burlingham v. Crouse*, 228 U.S. 459, 473 (1913)). The Code serves the interests of creditors by "consolidat[ing] the debtor's assets into a broadly defined estate from which, in an equitable and orderly process, the debtor's unsatisfied obligations to creditors are paid to the extent possible." *In re Andrews*, 80 F.3d 906, 909-10 (4th Cir. 1996) (footnote omitted).

At the same time, the Code aims to "grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286, 287 (1991)). This fresh start allows the debtor to "restructure [his] financial obligations, discharge [his] pre-existing debt, and emerge from bankruptcy with a new capital structure that better reflects financial reality." *Bosiger v. U.S. Airways*, 510 F.3d 442, 448 (4th Cir. 2007). To ensure that a debtor is able to receive this fresh start, the Code prevents creditors from making claims on certain assets. *See* 11 U.S.C. § 522. These so-called exemptions ensure that individuals are able to actually rehabilitate themselves after the bankruptcy process has concluded.

Although the interests of creditors and debtors are at odds during insolvency—the creditor would like to be paid in full and the debtor would like to pay as little as possible—as a general matter, the Code's balance benefits creditors and debtors alike. *See generally* Douglas C. Baird, *Bankruptcy's Uncontested Axioms*, 108 Yale L.J. 573, 583-86 (1998); Thomas H. Jackson, *The Fresh-Start Policy in Bankruptcy Law*, 98 Harv. L. Rev. 1393, 1424-47 (1985). If debtors had to pay their creditors no matter what, or if they were forced to give up all their assets before they could discharge their debts,

individuals and businesses would be less likely to borrow money. In protecting certain assets from creditor claims, the Code incentivizes individuals to incur debt and thereby support both creditors and our capital markets. Similarly, by ensuring that creditors receive a fair and predictable distribution of assets, the Code reduces the risks creditors face and allows creditors to account for the risk that a borrower will fail to repay. The benefit of these decreased risks is then passed on to debtors in the form of lower interest rates. The fresh start policy is therefore "of public as well as private interest." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

In furtherance of this dual mandate, the Code supplies various avenues of relief to debtors seeking to discharge their debts. Relevant here is Chapter 7, which allows debtors to discharge their outstanding debts in exchange for liquidating their nonexempt assets and distributing them to their creditors. Chapter 7 also supplies various tools for bankruptcy courts to use in policing the Code's enduring tension between debtors and creditors. This case involves § 707(a), which sets forth the grounds on which a Chapter 7 bankruptcy petition may be dismissed:

> The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including—
>
> > (1) unreasonable delay by the debtor that is prejudicial to creditors;
> >
> > (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
> >
> > (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

11 U.S.C. § 707(a).

"Cause" is an open-ended term. It is not defined in § 707(a), and the examples provided are illustrative rather than exhaustive. *See id.* § 102(3) (noting that for purposes of the Code, "'includes' and 'including' are not limiting"); *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."). Bankruptcy courts are therefore left to determine case by case what constitutes valid cause for dismissal of a Chapter 7 bankruptcy petition.

III.

A.

For the most part, courts have recognized that a debtor's bad faith in filing may constitute cause for dismissal under § 707(a). *See In re Krueger*, 812 F.3d 365, 370 (5th Cir. 2016) ("[A] debtor's bad faith in the bankruptcy process can serve as the basis of a dismissal 'for cause' . . . ."); *In re Schwartz*, 799 F.3d 760, 764 (7th Cir. 2015) ("[A]n unjustified refusal to pay one's debts is a valid ground under 11 U.S.C. § 707(a) to deny a discharge of a bankrupt's debts."); *Piazza*, 719 F.3d at 1260-61 ("[T]he power to dismiss 'for cause' in § 707(a) includes the power to involuntarily dismiss a Chapter 7 case based on prepetition bad faith."); *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000) ("Section 707(a) allows a bankruptcy court to dismiss a petition for cause if the petitioner fails to demonstrate his good faith in filing."); *In re Zick*, 931 F.2d 1124, 1127 (6th Cir. 1991) ("[L]ack of good faith is a valid basis of decision in a 'for cause' dismissal by a

9

bankruptcy court."). *But see In re Padilla*, 222 F.3d 1184, 1191 (9th Cir. 2000) ("[B]ad faith as a general proposition does not provide 'cause' to dismiss a Chapter 7 petition under § 707(a)."); *In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir. 1994) (adopting a "narrow, cautious" approach that requires "extreme misconduct falling outside the purview of more specific Code provisions").

We think the majority view is the sounder one, because it is the most helpful in preventing serious abuses of the bankruptcy process. But acknowledging that bad faith may constitute "cause" under § 707(a) also requires that the remedy of dismissal be reserved for cases of real misconduct. Those courts that have found that bad faith in filing for bankruptcy can constitute cause for dismissal have counseled "[c]aution in dispensing the remedy of dismissal for bad faith" because of "the need . . . to maintain the balance of remedies in bankruptcy." *In re Khan*, 172 B.R. 613, 626 (Bankr. D. Minn. 1994). They have accordingly emphasized that the bar for finding bad faith is a high one. *See, e.g.*, *Zick*, 931 F.2d at 1129 (explaining that bad faith exists "only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish life-style, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence"). In short, bad faith exists only where "the petitioner has abused the provisions, purpose, or spirit of bankruptcy law." *Tamecki*, 229 F.3d at 207.

## B.

The concept of bad faith "does not lend itself to a strict formula." *Piazza*, 719 F.3d at 1271. Courts must consider the totality of the circumstances underlying each case to

10

determine whether a debtor has acted in bad faith. To aid in this effort, bankruptcy courts have developed a number of multifactor tests. *See, e.g.*, *McDow*, 295 B.R. at 79 n.22 (proposing eleven factors); *In re Griffieth*, 209 B.R. 823, 827 (Bankr. N.D.N.Y. 1996) (proposing six factors); *In re Spagnolia*, 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995) (proposing fourteen factors). These tests are meant to be guides only. A bankruptcy court need not mechanically tick off each factor and tally up its tick-marks at the end. It may be the case that many factors are relevant, or it may be the case that relatively few of them are. It all depends. Evaluating these factors and their comparative relevance is a discretionary exercise that is best left to bankruptcy judges. After all, many of the potentially pertinent factors involve credibility determinations or exercises in fact-finding. *See, e.g.*, *Griffieth*, 209 B.R. at 827 ("debtor's failure to make significant lifestyle changes"); *Spagnolia*, 199 B.R. at 365 ("an intent to avoid a large single debt"); *id.* ("debtor is paying debts to insiders").

The bankruptcy court in this case employed the eleven-factor bad-faith test set forth in *McDow*, 295 B.R. at 79 n.22. Those eleven factors represent a distillation of the various "totality of the circumstances test[s]" courts have applied in determining whether a debtor's actions amounted to bad-faith cause for dismissal. *Id.* at 79. They are meant to represent the "factors [that] are typically considered" in that analysis. *Id.* at 79 n.22. Among them are "[t]he debtor's lack of candor and completeness in his statements and schedules"; "[t]he debtor has sufficient resources to repay his debts, and leads a lavish lifestyle"; "[t]he debtor's motivation in filing is to avoid a large single debt incurred

11

through conduct akin to fraud, misconduct, or gross negligence"; and "[t]he debtor's lack of attempt to repay creditors." *See id.*[4]

Careful consideration of the *McDow* factors here—aided by lengthy briefing from the parties, dozens of exhibits, and a three-hour evidentiary hearing—led the bankruptcy court to conclude that Romero had not acted in bad faith. While Janvey's judgment may have been Romero's "primary motivation in filing," the bankruptcy court found that it was not the only reason he filed. *Romero*, 557 B.R. at 883. Romero's wife was suffering from a brain infection that required extensive care and left her "100% incapacitated for work." *Id.* at 879. The bankruptcy court found that this infection had impaired her motor skills, balance, and eyesight to such an extent that she and Romero had to remodel their home so that she could live on the first floor. *Id.* It also found that Romero's wife's condition had at one point necessitated employment of a live-in caretaker and that it still required "a daily home caregiver, except for Sundays and part of Saturdays when [Romero] manages his wife's care on his own." *Id.* Moreover, the court noted that two of Romero's wife's disability policies—which together comprised the majority of her disability payments—were about to end when he filed for bankruptcy. *Id.* at 879, 883-84.

---

[4] The other seven factors are: "[t]he debtor's concealment or misrepresentation of assets and/or sources of income"; "[t]he debtor's petition is part of a 'deliberate and persistent pattern' of evading a single creditor"; "[t]he debtor is 'overutilizing the protection of the Code' to the detriment to his creditors"; "[t]he debtor reduced his creditors to a single creditor prior to filing the petition"; "[t]he debtor's payment of debts to insider creditors"; "[t]he debtor's 'procedural gymnastics' that have the effect of frustrating creditors"; and "[t]he unfairness of the debtor's use of the bankruptcy process." *McDow*, 295 B.R. at 79 n.22.

It predicted that the subsequent termination of these policies would result in an increase in the couple's out-of-pocket medical expenses, which were already steep at $55,000 in the year before Romero filed. *Id.* at 884.

The bankruptcy court also found that, as a result of his affiliation with Stanford, Romero had "found it impossible to obtain work." *Id.* at 883. And he still owed approximately $150,000 in legal fees from the underlying litigation, in which Janvey had employed "aggressive and costly litigation tactics." *Id.* at 884. The bankruptcy court commended Romero for being candid, forthcoming, timely, and cooperative throughout both the instant and the underlying litigation. It explained that he had surrendered his nonexempt assets and twice attempted to settle with Janvey. The bankruptcy court also found that Romero's lifestyle was "comfortable, but not exorbitant." *Id.* at 883. And it found nothing duplicitous about Romero's desire to preserve exempt assets he and his wife would "be required to live off" in the future. *Id.* at 885. In light of these circumstances, the bankruptcy court concluded that no "cause" for dismissal existed in this case.

## IV.

Janvey raises three primary objections to the bankruptcy court's denial of his motion to dismiss. First, he argues that Romero should not be allowed to benefit from the Code's protections because he filed for bankruptcy solely to avoid Janvey's judgment. Second, he suggests that Romero's efforts to settle the underlying litigation betrayed his bad-faith motive. And finally, Janvey maintains that Romero's petition ought to be dismissed on the basis of his substantial assets and attendant ability to pay the judgment.

Each of these objections is rooted in a factor that may well prove relevant to the bad-faith analysis. *See McDow*, 295 B.R. at 79 n.22 (listing as potentially relevant factors "[t]he debtor's motivation in filing is to avoid a large single debt incurred through" improper conduct; "[t]he debtor's lack of attempt to repay creditors"; and the debtor's "sufficient resources to repay his debts"). But there is a risk in elevating any single factor above all others as the sine qua non of bad faith. And yet this is precisely what Janvey's objections would have us do.

A.

Janvey first objects that bankruptcy should be unavailable to Romero because he seeks to avoid a single large debt—namely, Janvey's judgment against him. This objection is flawed for two reasons.

As a factual matter, it is simply not the case that Romero filed for bankruptcy solely to avoid the judgment. The bankruptcy court found that Romero filed for many reasons. *Romero*, 557 B.R. at 883-84. Chief among his motivations was his wife's medical condition, which left her totally incapacitated and entailed substantial expenses for her care. Additionally, Romero had multiple debts. Aside from to the $1.275 million he owed Janvey, he also owed debts to two separate law firms totaling approximately $150,000. The fact that Janvey's judgment accounted for roughly 90% of Romero's total debt does not negate those other claims. In fact, courts have declined to dismiss Chapter 7 petitions filed in response to debts that constitute similarly large fractions of the debtor's total debt. *See In re Bage*, No. 13-33367, 2014 WL 4749072, at *2, *5 (Bankr. N.D. Ohio Sept. 24, 2014) (denying a motion to dismiss where litigation-related debt accounted for

14

more than 90% of the total unsecured debt); *In re Ajunwa*, No. 11-11363 (ALG), 2012 WL 3820638, at \*1, \*9 (Bankr. S.D.N.Y. Sept. 4, 2012) (denying a motion to dismiss where one judgment "accounted for over 90% of the total claims listed").

As a legal matter, the fact that a bankruptcy petition was filed in response to a single debt need not alone constitute bad-faith cause for dismissal. "Almost every bankruptcy case is filed because a creditor is pursuing a debtor." *In re Bushyhead*, 525 B.R. 136, 149 (Bankr. N.D. Okla. 2015). The purpose of bankruptcy law, after all, "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life.'" *Grogan*, 498 U.S. at 286 (quoting *Local Loan Co.*, 292 U.S. at 244). A person becomes insolvent when he is no longer able to meet his financial obligations as they become due. *See* 11 U.S.C. § 101(32)(A). This may happen over time, or it may happen very suddenly. But in every case, the debtor reaches a tipping point. That may well happen because of a single additional debt. And that debt may be either large or small. It may be the result of litigation, or it may be the product of a large hospital bill or a decline in the housing market. Regardless, equating a decision to file for bankruptcy in response to a sizeable debt with cause for dismissal would fault debtors for using the Code in precisely the way Congress intended. As one bankruptcy court has observed, "if filing bankruptcy to avoid the payment of a debt was cause for dismissal, no debtor would ever be able to file a bankruptcy case." *In re Uche*, 555 B.R. 57, 62 (Bankr. M.D. Fla. 2016).

For these reasons, courts have frequently held that without additional evidence of fraud or misconduct, the fact that a debtor filed for bankruptcy in response to a single

15

large debt is not sufficient for a finding of bad faith. *See, e.g.*, *In re Chovev*, 559 B.R. 339, 347 (Bankr. E.D.N.Y. 2016); *In re McVicker*, 546 B.R. 46, 51 (N.D. Ohio 2016); *In re Gutierrez*, 528 B.R. 1, 15 (Bankr. D. Vt. 2014); *In re Grullon*, No. 13-11716 (ALG), 2014 WL 2109924, at *3 (Bankr. S.D.N.Y. May 20, 2014); *In re Mazzella*, No. 09-78449-478, 2010 WL 5058395, at *6 (Bankr. E.D.N.Y. Dec. 6, 2010); *In re Glunk*, 342 B.R. 717, 736 (Bankr. E.D. Pa. 2006).

None of this is to say that courts may not consider the nature of a debtor's motivation to file for bankruptcy. The fact that a bankruptcy petition was filed to skirt the collection efforts of a single creditor may well prove relevant in the overall bad-faith analysis. *See McDow*, 295 B.R. at 79 n.22 (listing this factor among others); *Griffieth*, 209 B.R. at 827 (same); *Spagnolia*, 199 B.R. at 365 (same). Indeed, both the district and bankruptcy courts below took note of the fact that Janvey's judgment served as the catalyst for Romero's bankruptcy petition. But Janvey now attempts to transform this single factor into a per se test for bad faith. Because such an attempt would blind us to the totality of Romero's circumstances, we reject it.

B.

Janvey's second objection attributes bad-faith motivation to Romero's two attempts to settle the underlying judgment. He suggests that Romero was trying to pressure him into accepting a mere fraction of his judgment by casting bankruptcy as the alternative to settlement.

Janvey was, of course, well within his rights to reject Romero's settlement offers. But we find groundless the notion that Romero's attempts to settle with a judgment

16

creditor constitute cause to dismiss his case. The law encourages voluntary settlement of disputes. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) ("[I]t is the policy of the law to encourage settlements."); *Bank of Am. Nat. Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 344 (3d Cir. 1986) (describing "the strong public interest in encouraging settlement of private litigation"). Settlement yields both private and public benefits. It spares the parties substantial costs in terms of time and money, and it lightens the docket of a resource-strapped judicial system.

In line with these principles, debtors and creditors remain free to settle their debts among themselves outside the courtroom and before resorting to bankruptcy. The tools at their disposal are varied. A creditor, for instance, may choose to forbear from immediately collecting a debt and thereby offer the debtor a momentary reprieve. Or he may allow the debtor to refinance or modify his loan in order to provide a more permanent solution. Settlement is simply a way creditors and debtors can avoid protracted litigation and resolve their disputes in a mutually satisfactory manner.

But the fact that parties often settle does not mean that the failure to settle should deprive debtors of the backstop provided by bankruptcy law. Far from amounting to "blackmail," Appellant's Br. at 38, the backstop of bankruptcy encourages parties to come to the table to reach an agreement when debts cannot be paid in full. It is altogether right that the parties can rest assured that, should settlement fail, bankruptcy will provide a way for them to resolve their case.

There are, to be sure, limitations on settlement in bankruptcy, among them the prohibition on preferred treatment of certain creditors in the immediate prepetition

period. *See* 11 U.S.C. § 547. But the Code's voidable preference provisions are designed to prevent parties from privileging some creditors at the expense of others; they are not designed to hinder the efforts of parties to settle to avoid bankruptcy in the first place. Nobody has claimed that questions of preference are at issue here. Rather, Janvey claims that Romero's two settlement offers were unacceptably low. But the bankruptcy court determined that this was not the entire story. *Romero*, 557 B.R. at 884. As Janvey himself explained in rejecting Romero's second settlement offer, "[p]ursuing the Ambassador ha[d] strategic importance beyond the amount of money involved." *Id.* at 878. Janvey sought to make an example of Romero to ease his collection efforts elsewhere. He aimed to show through his relentless pursuit of the judgment that those found liable in the Ponzi scheme litigation would be required to compensate the victims in full. But just as Janvey was within his rights to reject Romero's settlement offers, Romero, too, had every right to take advantage of the mechanism by which insolvent individuals can discharge their debts.

## C.

Janvey's final objection boils down to a belief that Romero should not be allowed to discharge his debts in bankruptcy because he has too much money. Janvey suggests that Romero should use his substantial assets—which were almost all exempt—to pay the judgment against him. This argument falters not only on its assumption that a debtor's ability to repay his debts alone constitutes cause for dismissal but also on its reliance on Romero's exempt assets. We address these flaws in turn.

18

A debtor's ability to repay debts does not alone amount to cause for dismissal. *See Bushyhead*, 525 B.R. at 148 (noting a "consensus among the courts" on this issue). As the House Report noted, "[t]he section [§ 707(a)] does not contemplate . . . that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal."[5] H.R. Rep. No. 95-595, at 380 (1977). Such a conclusion also follows logically from the Code's fresh-start philosophy. A penniless start is not a fresh start. Were absolute depletion of one's assets a prerequisite for bankruptcy relief, debtors and their families would be left destitute and without the means to become productive members of society. This would increase the strain on our social safety net by increasing the number of people who might potentially qualify for government benefits.

Forcing a debtor to repay his debts using exempt assets before resorting to bankruptcy would also undercut the entire exemption scheme that Congress designed. The "historical purpose" of bankruptcy exemptions "has been to protect a debtor from his creditors, to provide him with the basic necessities of life so that even if his creditors levy on all of his nonexempt property, the debtor will not be left destitute and a public charge." H.R. Rep. No. 95-595, at 126. Bankruptcy exemptions are meant to "afford the debtor some economic and social stability, which is important to the fresh start guaranteed by bankruptcy." *In re Morehead*, 283 F.3d 199, 203 (4th Cir. 2002). They

---

[5] The language of what is today § 707(a) was enacted as § 707. *See* Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549, 2606 (codified as amended at 11 U.S.C. § 707(a)). It was later renumbered as § 707(a) when §707(b) was added to the provision in 1984. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333, 355 (codified as amended at 11 U.S.C. § 707(a)).

represent a careful balance of "the difficult choices that exemption limits impose on debtors with the economic harm that exemptions visit on creditors." *Schwab v. Reilly*, 560 U.S. 770, 791 (2010). Janvey's suggestion that Romero should use his exempt assets to pay the judgment turns this carefully crafted scheme on its head. We reiterate that the ability to repay debts may be a relevant factor in the holistic bad-faith analysis. *See McDow*, 295 B.R. at 79 n.22. But for the reasons stated above, we reject Janvey's attempt to transform it into a per se bar to bankruptcy relief.

V.

In ruling that the bankruptcy and district courts did not err in declining to dismiss Romero's petition, we remain aware that the bankruptcy process is subject to real abuse. *See Robinson v. Worley*, 849 F.3d 577, 583 (4th Cir. 2017) (denying debtor a discharge for "knowingly and fraudulently" making "a false oath or account" under 11 U.S.C. § 727(a)(4) (quoting 11 U.S.C. § 727(a)(4)(A))). Any process that is established for legitimate reasons will occasionally be hijacked for illegitimate ends. It remains for bankruptcy judges to detect in the first instance those cases of fraud upon the court and creditors that constitute cause for dismissal under § 707(a) or reason for a denial of discharge under the scenarios set forth in 11 U.S.C. § 727(a). The standard of review— one of abuse of discretion—is of paramount importance here. We do not ask whether we necessarily would have reached the same result as the bankruptcy court, but we do note its greater familiarity with Romero's case and the fact that the court gave good and sound reasons for ruling as it did. Its decision is hereby

*AFFIRMED*.